MELLON BANK, N.A., Plaintiff-Appellant and Cross-Appellee, v. MIDWEST BANK AND TRUST COMPANY, as Trustee, *et al.*, Defendants (Waveland Associates-Phase I Limited Partnership, Defendant-Appellee; Development Management Group, Inc., Defendant-Appellee and Cross-Appellant).

First District (1st Division)   No. 1—91—3648

Opinion filed May 3, 1993.

Sidley & Austin, of Chicago (Gerald L. Angst, Lisa A. Hausten, and Robert T. Buskup, of counsel), for appellant.

Pope & John, of Chicago (William R. Quinlan, Bruce R. Meckler, and Brian J. Williams, of counsel), for appellee Waveland Associates-Phase I Limited Partnership.

Rudnick & Wolfe, of Chicago (Theodore A. Shapero and David G. Lynch, of counsel), for appellee Development Management Group, Inc.

JUSTICE BUCKLEY delivered the opinion of the court:

Plaintiff Mellon Bank, N.A. (Mellon), filed this action to foreclose a 1989 mortgage on the "New York," a high-rise apartment complex located at 3660 North Lake Shore Drive in Chicago, which is beneficially owned by the mortgagor/defendant, Waveland Associates-Phase I Limited Partnership (the Phase I Partnership). As part of this action, Mellon moved pursuant to the Illinois Mortgage Foreclosure Law (the IMFL) (Ill. Rev. Stat. 1989, ch. 110, par. 15—1101 *et seq.*) for the appointment of a receiver to manage and conserve the subject property during the pendency of the foreclosure action.

The Phase I Partnership defended on the merits against the appointment of a receiver and alleged affirmative defenses seeking to bar Mellon's claims. Defendant Development Management Group, Inc. (DMG), objected to Mellon's motion and counterclaimed, alleging that it had a superior lien on the property. DMG sought foreclosure and the sale of the New York, and an order placing it, not Mellon, in possession.

The circuit court denied relief to both Mellon and DMG. Mellon appeals the denial of its motion to have a receiver appointed. DMG has cross-appealed the circuit court's denial of its motion for possession of the property and the right to appoint a receiver based on its superior interest.

At oral argument, counsel for the Phase I Partnership raised the issue that this appeal is moot in light of Mellon's filing of another action seeking to foreclose a "senior" mortgage executed in 1985. The appointment of a receiver is sought in that action as well. We allowed both Mellon and the Phase I Partnership to address the issue of mootness through additional briefing. For reasons we later express, we find this appeal not moot.

The Phase I Partnership is an Illinois limited partnership with "Waveland Associates, an Illinois Limited Partnership" (the Phase I General Partner), as the sole general partner. The general partner of the Phase I General Partner is Lake Shore Land Limited Partnership, which has three general partners, two of which are DMG and Archer Corporation. Louis R. Silverman is the sole shareholder of DMG and Archer.

In 1980, DMG purchased the land upon which the New York now rests for $3,635,000. DMG in turn sold the property to the Phase I General Partner under an installment contract dated October 1, 1980. The Phase I General Partner made a down payment to DMG, and the balance accrued interest at 18% *per annum* through October 1, 1982, and 20% *per annum* thereafter. By December 1985, the balance due DMG was $14,527,000.

In November 1985, DMG and the Phase I General Partner agreed to amend the installment contract. The amended installment contract allowed the parties to divide the land into two parcels, one encompassing the New York, the other encompassing the remaining land, the latter being reserved for future development. DMG and the Phase I General Partner allocated $11,180,000 of the debt to the New York, with the Phase I General Partner making a $6,365,000 down payment and the balance being paid on a deferred basis. The amendment contained the following provision: "The payments provided for hereunder shall be contractual obligations of [the Phase I General Partner] or its assignee which shall not be secured by the real estate."

The Phase I General Partner subsequently assigned to the Phase I Partnership its right to acquire the New York. The Phase I Partnership assumed the Phase I General Partner's obligations under the installment contract.

To finance the construction of the New York, a commitment was obtained from the City of Chicago to issue low-interest, tax-exempt revenue bonds. This arrangement, and the related financing of the New York, consisted of the following seven elements.

1. *The Loan Agreement and Indenture.* Pursuant to a loan and disbursement agreement (Loan Agreement), the Phase I Partnership obtained a commitment from the City of Chicago for the issuance of

$62,600,000 in bonds, which included both the amount projected for construction of the New York ($56,400,000) and a debt service reserve fund (the Reserve Fund) of $6,200,000 as security for the bonds. The Loan Agreement set forth the terms and conditions under which the bonds were to be issued and the proceeds thereof loaned to the Phase I Partnership.

The City also entered into a trust indenture (the Trust Indenture) with the First National Bank of Chicago (the Bond Trustee) setting forth the terms and conditions under which the bonds were to be issued and repaid. The City then assigned its interest in the Loan Agreement to the Bond Trustee.

2. *The Reserve Fund Investment Agreement.* The Bond Trustee entered into an investment agreement with Mellon (the Reserve Fund Investment Agreement) wherein the Bond Trustee deposited the Reserve Fund with Mellon for investment, and Mellon agreed to pay the Bond Trustee a rate of return equal to the interest that would accrue on $6,200,000 of bonds.

3. *The Letter of Credit.* As security for the bonds, the Phase I Partnership obtained Mellon's commitment to issue a direct pay letter of credit in the amount of $57,810,000, which covered construction costs ($56,400,000) and two months' interest. Mellon's letter of credit operated as follows: On the first day of each month, the Bond Trustee would draw down Mellon's letter of credit in an amount equal to the debt service payment and distribute it to the bondholders. The Phase I Partnership was obligated pursuant to both the Loan Agreement and a reimbursement agreement to deposit an equal amount with the Bond Trustee on the same day, and the Trustee would immediately reimburse Mellon for the amount drawn on the letter of credit.

Mellon's letter of credit was the subject of a confirmatory letter of credit issued by the Deutsche Bank in the amount of $57,810,000 (the Deutsche Bank Confirmation), which guaranteed Mellon's obligations. The Deutsche Bank also issued an irrevocable standby letter of credit in the amount of $6,355,000 which guaranteed Mellon's obligations relative to the Reserve Fund (the Standby Letter of Credit).

In its motion for the appointment of a receiver, Mellon alleges that the Phase I Partnership is in default under the reimbursement agreement in the amount of about $3.5 million.

4. *The Remarketing Agreement.* Bondholders were permitted to tender the bonds for payment in full at any time. Mellon and the Phase I Partnership entered a remarketing agreement (the Remarketing Agreement) whereby Mellon, for a fee, agreed to pay off or

resell any bonds tendered by the bondholders. Mellon alleges in its motion that the Phase I Partnership is in default under this agreement.

5. *The Interest Rate Exchange Agreement.* The bonds were issued at a floating rate of interest, and the Phase I Partnership wanted protection against rate fluctuations. Accordingly, the Phase I Partnership and Mellon entered into an interest rate exchange agreement whereby the Phase I Partnership agreed to pay Mellon a fixed rate of interest each month and Mellon agreed to bear the risk of the rate fluctuations. Mellon alleges in its motion that the Phase I Partnership is in default under this agreement in the amount of about $1.2 million and further owes Mellon $7 million in connection with the termination of this agreement.

6. *The Collateral Assignment.* As additional security to Mellon, DMG assigned to Mellon its right to receive the deferred payments under the amended installment contract to purchase the New York (the Collateral Assignment).

7. *The 1985 Mortgage and Assignment of Rents and Leases.* As further security to Mellon, the Phase I Partnership executed a senior mortgage (the 1985 mortgage) on the New York. The Phase I Partnership additionally gave Mellon an assignment of rents and leases from the New York.

By 1989, the Phase I Partnership had exhausted all, except for the Reserve Fund, of the bond proceeds under the Loan Agreement. However, the Phase I Partnership had not paid all of the construction costs and was delinquent in its payments to Mellon. A plan was devised in which the Reserve Fund could provide additional funds to the project at a low cost.

On November 1, 1989, the Phase I Partnership and the Bond Trustee executed an amendment to the Loan Agreement. This amendment: (1) eliminated the Reserve Fund requirement; (2) increased Mellon's letter of credit by $6.355 million—an amount equal to the prior Reserve Fund plus certain interest; and (3) cancelled the Reserve Fund Investment Agreement.

The newly released monies were used to pay DMG the deferred payments on the property, and DMG immediately loaned the money back to the Phase I Partnership for its use. The purpose of this latter transaction was to preserve the low interest rate and tax-exempt status of the bonds. Concomitantly, as part of this transaction, Mellon agreed to rescind the Collateral Assignment between it and DMG so that DMG could receive the deferred payments.

As security for Mellon's agreement to increase its letter of credit by $6.355 million, the Phase I Partnership executed a junior

mortgage on the property (the 1989 mortgage). The 1989 mortgage is the subject of the present foreclosure action and motion to appoint a receiver.

In response to Mellon's complaint and motion to appoint a receiver, the Phase I Partnership filed a verified answer with affirmative defenses and objected to the appointment of a receiver. The thrust of the Phase I Partnership's answer, affirmative defenses and objections is that the 1989 mortgage is invalid and not supported by consideration, that the doctrine of unclean hands bars Mellon's claims, and that Mellon should be equitably estopped from asserting its claims.

As for DMG, it answered Mellon's complaint, alleged an affirmative defense and counterclaimed. DMG took the position that it, not Mellon, was the senior mortgagee entitled to possession by virtue of an equitable vendor's lien which predated the 1989 Mortgage. DMG referenced the amended installment contract which it entered in 1985 with the Phase I General Partner, the rights to which the Phase I Partnership later acquired. DMG alleged that it was still owed substantial monies under the installment contract and that this contract predated Mellon's 1989 mortgage. DMG accordingly sought to foreclose its prior equitable lien, have the New York sold, and have an order entered which awarded it possession of the New York for purposes of collecting the rents to satisfy its lien. Mellon replied to DMG's claims that certain language (previously quoted) within the amended installment contract amounted to a waiver by DMG of any equitable vendor's lien.

On November 4, 1991, the circuit court held a hearing on Mellon's motion. Following argument, the court denied both Mellon's motion and DMG's counterclaim for possession, stating:

> "I'm aware what Mellon request. I'm going to deny that a receiver be appointed at this time because you haven't shown me that you are really entitled to a receiver.
>
> Money, loss of money, doesn't mean irreparable damage. There is a question as to whether your 1989 mortgage is, indeed, a good mortgage. You may well prove that it is, but right now there's a question; and I'm not going to change the status quo, and I'm not putting DMG in possession, either. I'm going to let matters remain in status quo."

The present appeal encompasses three primary issues: (1) what is the proper standard of review of a final order which denies a motion seeking the appointment of a receiver under the IMFL; (2) whether the circuit court correctly decided that Mellon was not entitled to the appointment of a receiver; and (3) if Mellon was so entitled, is the

1989 mortgage superior to DMG's claimed equitable vendor's lien. We also address the matter of mootness.

●1 The applicable standard of review, and Mellon's entitlement to a receiver, must begin with a discussion of the relevant statutory provisions of the IMFL. Central of these provisions is part 17 of the IMFL, which pertains to possession during foreclosure. Part 17 begins with section 15—1701:

> "§ 15—1701. Right to possession. (a) General. The provisions of this Article shall govern the right to possession of the mortgaged real estate during foreclosure. Possession under this Article includes physical possession of the mortgaged real estate to the same extent to which the mortgagor, absent the foreclosure, would have been entitled to physical possession. ***

> (b) Pre-Judgment. Prior to the entry of a judgment of foreclosure: (1) In the case of residential real estate, the mortgagor shall be entitled to possession of the real estate except if (i) the mortgagee shall object and show good cause, (ii) the mortgagee is so authorized by the terms of the mortgage or other written instrument, and (iii) the court is satisfied that there is a reasonable probability that the mortgagee will prevail on a final hearing of the cause, the court shall upon request place the mortgagee in possession. ***

> (2) In all other cases, if (i) the mortgagee is so authorized by the terms of the mortgage or other written instrument, and (ii) the court is satisfied that there is a reasonable probability that the mortgagee will prevail on a final hearing of the cause, the mortgagee shall upon request be placed in possession of the real estate, except that if the mortgagor shall object and show good cause, the court shall allow the mortgagor to remain in possession." Ill. Rev. Stat. 1989, ch. 110, par. 15—1701.

Aside from section 15—1701, section 15—1702 contains the following provision: "Whenever a mortgagee *entitled to possession* so requests, the court shall appoint a *receiver*." (Emphasis added.) (Ill. Rev. Stat. 1989, ch. 110, par. 15—1702(a).) A final section relevant to the determination of the applicable standard of review is section 15—1105, which provides: "The word 'shall' as used in this Article [15] means mandatory and not permissive." Ill. Rev. Stat. 1989, ch. 110, par. 15—1105(b).

In *Travelers Insurance Co. v. La Salle National Bank* (1990), 200 Ill. App. 3d 139, 558 N.E.2d 579, the second district interpreted section 15—1701 to evince a statutory presumptive right to possession in favor of the mortgagee in nonresidential real estate foreclosure actions, while in residential real estate foreclosure actions, the presumptive right to possession during foreclosure rests with the

mortgagor of the residential real estate. (*Travelers,* 200 Ill. App. 3d at 143, 558 N.E.2d at 581.) Numerous Federal district court decisions have followed *Travelers'* interpretation of the IMFL (see, *e.g., Home Life Insurance Co. v. American National Bank & Trust Co.* (N.D. Ill. 1991), 777 F. Supp. 629), and various commentators have interpreted the IMFL consistent with *Travelers* as well. (See F. Bernard & G. Thorpe, *Recent Illinois Mortgage Law Changes Affecting Commercial Mortgage Lending,* 76 Ill. B.J. 606, 612 (1988); S. Lindberg & F. Bender, *The Illinois Mortgage Foreclosure Law,* 76 Ill. B.J. 800, 807 (1987).) We adhere to this growing volume of authority in construing the IMFL under the present facts.

Turning to the appropriate standard of review in this case, we do not believe that we are bound by the traditional deferential standard of review utilized in appeals involving preliminary injunctive relief or those involving pre-IMFL law. Prior to the enactment of the IMFL, and consistent with judicial review of injunctive relief generally, Illinois' statutory provisions relating to mortgage foreclosures granted the court discretion to award a mortgagee possession during the pendency of the proceedings. (See Ill. Rev. Stat. 1983, ch. 110, pars. 15—113, 15—114, 15—302, 15—303, 15—305.) In interpreting this prior law, we held that the grant of receivership during foreclosure was discretionary with the trial court which, on appeal, was reviewable under an abuse of discretion standard. *De Kalb Bank v. Purdy* (1988), 166 Ill. App. 3d 709, 520 N.E.2d 957; *Brown County State Bank v. Kendrick* (1986), 140 Ill. App. 3d 538, 488 N.E.2d 1079; *Home Savings & Loan Association v. Samuel T. Isaac & Associates, Inc.* (1981), 99 Ill. App. 3d 795, 425 N.E.2d 985.

●2 We believe, however, the IMFL changed the law relative to whether a trial court has discretion to award possession pending the outcome of a foreclosure proceeding. We further believe that the standard of review applicable to possession awards or denials had been concomitantly changed.

First, the legislature's use of the word "shall" rather than "may" is persuasive evidence that trial courts were not intended to possess discretion regarding the award of possession once the IMFL's requirements are met. As noted, the mandatory nature of the IMFL is a departure from the legislature's prior enactment on the subject. Under settled statutory canons of construction, this departure demonstrates a legislative intent to change the law.

Second, the interpretation of statutory provisions is traditionally a question of law (*e.g., Johnson v. Town of the City of Evanston* (1976), 39 Ill. App. 3d 419, 350 N.E.2d 70) to which a deferential standard of review is inapplicable. Similarly, the award of possession under the

IMFL will largely turn on the construction of mortgages and other documentary evidence, a nondiscretionary function. Finally, while "a reasonable probability" of success on the merits is typically associated with a deferential standard of review, in the setting of the IMFL, such a determination will largely be a question of law. In Illinois, a proven default establishes a reasonable probability of success in a mortgage foreclosure action. (*Brown County State Bank v. Kendrick* (1986), 140 Ill. App. 3d 538, 541, 488 N.E.2d 1079, 1081; *Home Life Insurance Co. v. American National Bank & Trust Co.* (N.D. Ill. 1991), 777 F. Supp. 629, 631.) Whether a default in fact exists will typically turn on the interpretation of documentary evidence—a nondiscretionary function. For these reasons, we do not believe the IMFL contemplates a deferential standard of review. Our conclusion on this matter is even stronger in this case because the trial court, in the previously quoted ruling, made *no* findings of fact in denying Mellon's motion. Thus, we believe our review in this appeal is *de novo*, not deferential.

We now address whether the circuit court correctly denied Mellon's motion to appoint a receiver. For the reasons which follow, we believe the record affirmatively demonstrates Mellon's right to possession, and, simultaneously the absence of good cause.

●3 Mellon's entitlement to a receiver *pendente lite* required Mellon to show its entitlement to possession under section 15—1701 of the IMFL. (Ill. Rev. Stat. 1989, ch. 110, par. 15—1702 ("Whenever a mortgagee entitled to possession so requests, the court shall appoint a receiver").) Mellon's right to possession, in turn, hinged on Mellon proving that the terms of the 1989 mortgage authorized possession and, second, a reasonable probability that it would prevail on a final hearing of the cause. Once Mellon established the conditions entitling it to possession, Mellon was entitled to such possession, unless the Phase I Partnership objected and showed "good cause." *Travelers*, 200 Ill. App. 3d at 143, 558 N.E.2d at 581; Ill. Rev. Stat. 1989, ch. 110, par. 15—1701(b).

●4 Regarding the first requirement, the plain language of the 1989 mortgage authorized the appointment of a receiver:

> "Receivership. Upon, or at any time after, the filing of a complaint to foreclose this Mortgage the court in which such complaint is filed may appoint a receiver of the Mortgaged Property. Such appointment may be made either before or after the sale, without notice, without regard to the solvency or insolvency of Mortgagor or any other person who may be legally or equitably liable to pay moneys secured hereby at the time of application for such receiver, and without regard to the then value of the Mortgaged Property***."

This language satisfied the first requirement. No party disputes the execution of this mortgage. Indeed, the record reflects that the 1989 mortgage was prepared by a large Chicago law firm retained by the Phase I Partnership.

Relative to the second requirement, Mellon established a reasonable probability that it will prevail at the final hearing. As previously noted, a proven default establishes a reasonable probability of success in a mortgage foreclosure action. *Brown County State Bank v. Kendrick* (1986), 140 Ill. App. 3d 538, 541, 488 N.E.2d 1079, 1081; *Home Life Insurance Co. v. American National Bank & Trust Co.* (N.D. Ill. 1991), 777 F. Supp. 629, 631.

Here, to support its claim that the Phase I Partnership is in default, Mellon submitted the affidavit of J. David Thompson, first vice president of Mellon. In this affidavit, Thompson stated that the Phase I Partnership is in default in that it failed to pay 1989 and 1990 real estate taxes in the amount of $1,600,000; that mechanics' liens still exist on the property in the amount of $11 million; and that it has not been reimbursed since February 1991 for its payment to bondholders of principal and interest. Thompson asserts that the delinquency grows at $8,000/day. Under the terms of the 1989 mortgage, the Phase I Partnership's omissions render it in default of the 1989 mortgage. Mellon has accordingly established the second requirement.

Having established its right to possession, Mellon was entitled to such possession, unless the Phase I Partnership demonstrates "good cause." We find that good cause has not been established.

To support its good-cause argument, the Phase I Partnership advances numerous arguments which we summarize as follows: (1) the 1989 mortgage lacks consideration; (2) the 1989 mortgage is the product of Mellon's instigation of "maneuvers and sham transactions" which Mellon used to induce the Phase I Partnership to enter the 1989 mortgage to its detriment and that of the bondholders; and (3) Mellon allowed some late payments and is estopped from foreclosing its mortgage.

The Phase I Partnership has failed to establish good cause. The Phase I Partnership unpersuasively attempts to portray Mellon as an unscrupulous bank taking advantage of a poor, unsophisticated land owner in dire financial straits. For example, the Phase I Partnership states in its brief:

> "The record below shows that through a complex series of maneuvers and transactions (including the purported mortgage at issue), and to the detriment of [the Phase I Partnership] and the bondholders, Mellon improperly converted the monies from the

[Reserve Fund], which was designed solely to secure the bonds for the bondholders, and used these monies for its own purposes. As part of this scheme, Mellon induced [The Phase I Partnership] to enter into the 1989 Mortgage at issue and itself caused the alleged defaults upon which Mellon based its claim in the trial court."

The Phase I Partnership's self-portrayal rings hollow. While the New York may have been encountering financial difficulties, the Phase I Partnership knowingly assented to each of the transactions involved in this case, including the 1989 mortgage. At all relevant times, the Phase I Partnership was represented by a prominent Chicago law firm. Evidence in the record exists to show that all concerned parties were informed of the financial arrangements which gave rise to the 1989 mortgage, including Mellon's increase of its letter of credit; the elimination of the Reserve Fund requirement, the termination of the Reserve Fund Investment Agreement, DMG's loan of the proceeds of the Reserve Fund to the Phase I Partnership, and Mellon's release of its rights under the Collateral Assignment. Two letters in the record support this conclusion.

The first, dated July 5, 1989, is from this prominent Chicago law firm to Louis Silverman, one of the principal owners of the Phase I Partnership. (Silverman is the sole shareholder of DMG and Archer Corporation, which are two of the three general partners of Lake Shore Land Limited Partnership, which in turn is the sole general partner of the Phase I General Partner, which in turn is the sole general partner of the Phase I Partnership.) This letter advised Silverman as to what would be necessary to release the $6,200,000 within the Reserve Fund. It recommended that Mellon's letter of credit be increased to cover the amount within the Reserve Fund, which would then be released for purposes of paying project costs.

The second, dated December 11, 1989, is from the same law firm, but is written to the First National Bank of Chicago in its capacity as the Bond Trustee. The law firm then represented the Phase I Partnership. The law firm stated:

"The Partnership proposes to terminate both the [Reserve Fund] Investment Agreement and the [Standby] Deutsche Bank [letter of] Credit and increase the face amount of the [Mellon letter of] Credit (the 'Enhanced Credit') in an amount sufficient to cover the Debt Service Reserve Bonds, together with interest thereon. At the same time, the [Deutsche Bank] Confirmation would be increased (the 'Enhanced Confirmation') to an amount equal to the Enhanced Credit. No changes are being proposed which would alter in any manner (i) the use of the proceeds of the Bonds, or (ii) the amount of the timing of payments of principal or interest to the holders of the Bonds.

The Trustee has requested that we render our opinion as to whether under the circumstances, and from the standpoint of the holders of the Bonds, the combination of the Enhanced Credit and Enhanced Confirmation is equivalent in nature to the combination of the Credit, the Confirmation, the Investment Agreement, and the Deutsche Bank Credit.

\* \* \*

\*\*\* [I]t is our opinion as of the date hereof that the Enhanced Credit and the Enhanced Confirmation, when delivered to and accepted by the Trustee, will be the functional equivalent \*\*\*, in terms of priority of claim against the assets \*\*\* of Mellon and Deutsche Bank, respectively, of the obligations evidenced by the Credit, the Confirmation, the Investment Agreement, and the Deutsche Bank Credit.

Our conclusion is based upon and supported by the fact that, regardless of whether the Investment Agreement or the Enhanced Credit is the mechanism for payment, Mellon is and remains the obligator. It is Mellon's unsecured obligation to make the funds available for payment of the principal and interest under the Bonds. In each instance the expectation of payment is supported only by the creditworthiness of Mellon. In the event Mellon should fail for any reason to honor its obligations under either the Investment Agreement or the Credit, the result is the same—the Trustee would have a general unsecured claim against Mellon and would have recourse to Deutsche Bank under the Confirmation and the Deutsche Bank Credit, or following consummation of the proposed transaction, under the Enhanced Confirmation. Moreover, and as previously noted, the obligations of Mellon under both the Investment Agreement and the Credit are and have always been rated identically by Moody's. A similar analysis applies to the Confirmation and the Enhanced Confirmation."

These letters demonstrate to our satisfaction that the 1989 mortgage was executed by sophisticated businessmen with the assistance of counsel. This mortgage became Mellon's security for increasing its letter of credit. Good cause has thus far not been shown.

The Phase I Partnership's claim that the 1989 mortgage lacks consideration is equally unpersuasive. Again, the mortgage was executed in exchange for Mellon increasing its letter of credit by over $6 million. Mellon was under no obligation to increase its letter of credit, and Mellon was entitled to additional security upon doing so. The Phase I Partnership has cited no authority for its position that the 1989 mortgage is invalid merely because it is secured by the same property which secures Mellon's 1985 mortgage. Further, the Phase I Partnership recognized itself in its brief why the 1989 mortgage was created, rather than Mellon relying solely on its 1985 mortgage:

"The 1985 Mortgage, notably, was not amended because that may have resulted in the bonds no longer being tax exempt. If the bonds were no longer tax exempt, they could no longer be used to finance the project at a reduced interest rate. Thus, the 1989 Mortgage was created in part to preserve the tax exempt status of the bonds and to transfer the [Reserve Fund] without affecting the 1985 Mortgage. Thus, this procedure also prevented the necessity of the bonds being called, and maintained the viability of those bonds and their tax exempt status."

This statement within the Phase I Partnership's brief demonstrates that it too benefitted from the 1989 mortgage. Preserving the tax-exempt status of the bonds was in its best interest.

The Phase I Partnership's estoppel argument must also fail. Mellon's previous acceptance of late payments cannot prohibit Mellon from forever seeking to foreclose its mortgage. No authority has been advanced for this position. Further, it lacks record support. In a 1990 Investor Prospectus, the Phase I Partnership recognized that Mellon was under no obligation to accept late payments:

"Any amounts paid by Mellon under the letter of credit securing the bonds are required to be immediately reimbursed by the Phase I Partnership. This reimbursement obligation is secured by a first mortgage on Phase I. From time to time, the Phase I Partnership has not had sufficient funds to immediately reimburse Mellon. To date, Mellon has extended credit to the Phase I Partnership for 60 to 90 days rather than declaring an event of default, accelerating the loan to the Phase I partnership and foreclosing on Phase I. Mellon is not obligated to do so, however."

This statement, of course, contradicts the Phase I Partnership's assertion in its appellate brief that it was Mellon's "custom and practice" to accept late payments.

In summary, the Phase I Partnership's "good cause" arguments fail entirely. Under the IMFL, Mellon established its right to possession of the New York, and the circuit court erred in failing to grant Mellon's motion to appoint a receiver. Accordingly, that portion of the circuit court's order which denied Mellon's motion to appoint a receiver under the IMFL is reversed.

We next address DMG's alleged superior interest. DMG asserts that it is entitled to an equitable vendor's lien as a result of being owed monies by the Phase I Partnership under the real estate installment contract by which title was beneficially conveyed to the Phase I Partnership. At the time of sale, part payment was made, but roughly $4.8 million remained as a deferred payment. DMG accordingly asserts that it is entitled to an equitable vendor's lien, which predates Mellon's 1989 mortgage. Mellon responds that DMG has waived any such lien.

●5 "Where an express lien is not reserved, a lien is raised in chancery in favor of the vendor who has parted with legal title without payment, and it arises in every sale and conveyance of land when the purchaser has not paid the full purchase price." (35 Ill. L. & Prac. *Vendor & Purchaser* § 153 (1958).) "The vendor's implied lien is not an interest or estate in realty, nor is it a specific, absolute charge thereon, but merely an equitable right in the vendor by a proceeding in chancery to resort to the property in case the purchase price is not paid; it is not a debt or a right of property, but simply a remedy for the debt. It is limited to the property or interest therein sold." 35 Ill. L. & Prac. *Vendor & Purchaser* § 153 (1958).

●6 "Chancery will not create a vendor's implied lien where it is manifest from the contract of the parties that none was intended, and any act manifestly declaring an intention not to rely on the vendor's lien may defeat it or prevent it from attaching." (35 Ill. L. & Prac. *Vendor & Purchaser* § 154 (1958).) "The lien may be waived by declarations or acts of the vendor which show that he does not rely on or has abandoned the lien, such as by inducing another to deal with the property as unencumbered." 35 Ill. L. & Prac. *Vendor & Purchaser* § 154 (1958).

●7 In this case, we believe that DMG, a part owner of the Phase I Partnership, has waived any vendor's lien. First, in the third amendment to the articles of agreement for deed entered between DMG and the Phase I Partnership's assignor (the Phase I General Partner), the following provision was inserted:

> "The payments provided hereunder shall be contractual obligations of the purchaser or its assignee which shall not be secured by the real estate."

We interpret the above language as a waiver by DMG of its equitable lien. The language of the amendment—that "the payments *** hereunder *** shall not be secured by the real estate"—demonstrates that DMG would not look to the New York for deferred payments under the installment contract.

Second, on the same day that the Phase I General Partner signed the third amendment, the Phase I Partnership delivered a senior mortgage (the 1985 mortgage) to Mellon acknowledging that it was "a first and prior lien on and security interest in and to the Mortgaged Property subject to no other lien and subject to no other encumbrances." This language is inconsistent with the existence of a vendor's lien.

Third, in the previously referred to 1990 Investor Prospectus which the Phase I Partnership gave to prospective investors, the Phase I Partnership assured that DMG had no interest whatsoever in the property:

"The repayment of the balance owed to DMG is dependent upon the raising of additional equity by the Phase I Partnership and the status of Phase I operations. Title to the Phase I property was conveyed to the Phase I Partnership upon the initial payment to DMG from the bond proceeds. The balance owed by the Phase I Partnership is not a lien against the Phase I property and no partner in the Phase I Partnership is personally liable for its payment."

For these reasons, we believe that DMG's claim to a superior interest in the property must fail.

•8 We finally address the issue of mootness. The Phase I Partnership asserts that this appeal is moot because Mellon and the Bond Trustee have filed a separate action in the circuit court of Cook County to foreclose the 1985 mortgage. A motion to have a receiver appointed has also been sought in that action. The Phase I Partnership asserts that Mellon is seeking "essentially the same relief in each claim, namely to foreclose on a mortgage on the New York and to have a receiver appointed to manage the property." It argues that a judicial ruling on the 1985 mortgage would render unnecessary a ruling on the inferior, 1989 mortgage. The Phase I Partnership further asserts that Mellon has elected its remedies by pursuing foreclosure on the 1985 mortgage.

We do not view this appeal as moot, nor do we believe Mellon has elected its remedies by pursuing foreclosure on the 1985 and 1989 mortgages simultaneously. Other than citing to general propositions of law relative to mootness and election of remedies, the Phase I Partnership has presented this court with no persuasive authority to support its arguments. We fail to see how this court's decision relative to the appointment of a receiver is moot where the Phase I Partnership is still in possession of the property contrary to the wishes of Mellon. Our opinion in this appeal will be the first appellate decision to affect the status quo. Thus, contrary to the Phase I Partnership's argument, the issue of possession is very much alive, not academic. See Black's Law Dictionary 909 (5th ed. 1979) (defining "moot").

Nor are we presented with an election of remedies issue. Mellon's decision to simultaneously pursue its remedies under two different mortgages is proper. "The doctrine of the election of remedies is applicable only where a party has elected between inconsistent remedies for the same injury or cause of action." (*Harris v. Manor Healthcare Corp.* (1986), 111 Ill. 2d 350, 366, 489 N.E.2d 1374, 1381.) "The doctrine does not apply to concurrent remedies that are not inconsistent with each other ***." (*Manor Healthcare Corp.*, 111 Ill. 2d at

366, 489 N.E.2d at 1381.) Mellon's pursuit of foreclosure under the mortgages is both concurrent and consistent.

In summary we reverse the circuit court's denial of Mellon's motion to appoint a receiver pursuant to the IMFL and affirm the circuit court's denial of DMG's motion for possession.

Affirmed in part; reversed in part.

MANNING, P.J., and CAMPBELL, J., concur.