THIRD DIVISION
March 31, 2010

No. 1-09-3523

| | | |
|---|---|---|
| BANK OF AMERICA, N.A., a National Banking Association, Successor by Merger to LaSalle Bank National Association, as Agent for Lenders, | ) ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee and Counterdefendant-Appellee, | ) ) ) | |
| v. | ) ) | |
| 108 N. STATE RETAIL LLC, an Illinois Limited Liability Company, 108 N. STATE TRANSIT LLC, an Illinois Limited Liability Company, and UNKNOWN OWNERS and NONRECORD CLAIMANTS, | ) ) ) ) ) ) | Honorable, Margaret Brennan Judge Presiding. |
| Defendants-Appellants and | ) ) | |
| (Laurance H. Freed and DDL LLC, an Illinois Limited Liability Company, | ) ) ) | |
| Defendants and Counterplaintiffs; | ) ) | |
| 108 N. State Retail LLC, an Illinois Limited Liability Company, 108 N. State Transit, LLC, an Illinois Limited Liability Company, | ) ) ) ) | |
| Counterplaintiffs-Appellants). | ) | |

JUSTICE QUINN delivered the opinion of the court:

Defendants 108 N. State Retail LLC, 108 N. State Transit LLC, Laurence H. Freed and

DDL, LLC, appeal from an order of the trial court granting a motion for the appointment of a receiver in the mortgage foreclosure proceeding brought by plaintiff, Bank of America, N.A. On appeal, defendants contend that the trial court erred in appointing a receiver because (1) the plaintiff has no "reasonable probability" of prevailing on a final hearing of the cause; and (2) defendants have established good cause why they should remain in possession of the property pursuant to section 15-1701(b)(2) of the Illinois Mortgage Foreclosure Law (Foreclosure Law) (735 ILCS 5/15-1701(b)(2) (West 2006)). For the reasons set forth below, we affirm the trial court.

## I. BACKGROUND

The property that is the subject of this appeal is located at 108 North State Street in Chicago, Illinois, and is commonly referred to as "Block 37." The property currently consists of a building with four floors of retail space, four additional levels underground, an adjacent office building (that is not part of this action), and an underground pedway, which connects to Chicago Transit Authority (CTA) trains. Block 37 had been vacant for more than a decade when the City of Chicago (City) sold it in 2005 to the Mills Corporation. Pursuant to the "108 North State Redevelopment Agreement" (Redevelopment Agreement), between Mills Corporation and the City, the site was to be developed into a shopping, dining, and entertainment destination, and a new subway station was to be built underneath the site to serve as a transit hub. The Redevelopment Agreement described the scope of the project and specified the types of tenants that would be permitted to lease retail space in the new development.

Mills began work on the office and retail components of Block 37 in 2005, but financial

problems subsequently forced the company to sell the property. In 2007, Joseph Freed and Associates LLC (Freed), a Chicago-based real estate developer, formed two entities, 108 N. State Retail LLC and 108 N. State Transit LLC (the developers), that purchased and took over the development of the retail and CTA portions of the project. On or about March 22, 2007, the developers entered into a construction loan agreement (loan agreement), pursuant to which LaSalle Bank National Association (LaSalle) agreed to provide construction financing for the project in the maximum principal amount of $205,000,000. Freed's president, Laurance H. Freed, and Freed's parent company, DDL, LLC, guaranteed the loan, and pursuant to the loan agreement, were required to maintain $5 million in liquid assets. The loan was evidenced by a promissory note dated March 22, 2007, and secured by a construction mortgage, security agreement, assignment of rents and leases and fixture filing. The loan was amended by a modification agreement on or about May 21, 2007, pursuant to which certain portions of the original mortgaged property were released. Plaintiff, Bank of America, N.A. (bank), is the successor by virtue of the October 2008 merger of LaSalle into Bank of America. The bank brought the foreclosure action as agent for itself and other lenders.

One of the key provisions of the loan agreement at issue in this case was a requirement that the loan at all times be "in balance," meaning that the amount of funds available under the loan must equal or exceed the amount budgeted to complete the project. Section 7.4(d) provided that if the loan was not in balance, borrowers, within 10 days after a request by the bank, could deposit funds in an amount sufficient to place the loan in balance. Further, pursuant to section 11(k) of the loan agreement, a failure by the borrowers to maintain the loan in balance for a

period of 90 days after the date the bank requested that the borrowers make a deposit would constitute an "event of default."

Shortly after the developers took over the project, they realized that major improvements to the physical space were needed. In addition, the fourth-floor tenant, Strike Holdings, a company that operates bowling alleys, informed the developers that it would not go forward with its lease. The developers searched for a new tenant that would satisfy the requirements of the Redevelopment Agreement and on April 22, 2008, with the bank's approval, entered into a lease with Muvico, a company that operates first-run movie theaters.

Due to the additional costs required to improve and change the physical space of the property, the developers informed the bank in December 2007, that an additional $26 million in financing would be needed. At this time, defendants assert, the parties began ongoing discussions about modifying the loan to increase the principal amount. However, because the loan was not modified and the amount budgeted to complete the project now exceeded the amount available under the loan, the loan was out of balance under the terms of the loan agreement.

Subsequently, in March 2008, the parties entered into the first of at least 23 separate letter agreements pursuant to which the bank agreed to continue to disburse funds under the loan agreement if certain conditions were met. Specifically, the letter agreements acknowledged that a number of circumstances existed which constituted defaults under the loan agreement, including the fact that the loan was not in balance and the guarantors had not maintained at least $5 million in liquid assets. Further, the letter agreements stated that these defaults would constitute "events of default" under the loan agreement if not cured within 90 days. The letter agreements referred

to these defaults as "specific defaults" and stated that the borrowers and guarantors requested that the bank continue to disburse funds despite "the existence of the Specific Defaults, and any other Defaults or Events of Default under the loan documents that may exist as of the date of the funding of the Disbursement Request."

The bank's agreement to disburse the funds under the letter agreements was contingent upon the borrowers and guarantors acknowledging (1) that specific defaults had occurred and that the specific defaults will give rise to events of default if not cured within 90 days; (2) that by funding the disbursement request, the banks do not waive the specific defaults or events of default under the loan document or any of their rights or remedies available under the loan documents; and (3) that the borrowers and guarantors "do not have any defense, set-off or counterclaim to the payment or performance of any of their obligations under the Loan Documents, as modified and amended by the Modification." The first letter agreement was entered into on March 28, 2008, and the final letter agreement was entered into on August 25, 2009.

Meanwhile, in June 2009, the fourth-floor tenant, Muvico, underwent a corporate restructuring and informed the developers that it could not honor its lease. However, Muvico and the developers reached an alternative arrangement, pursuant to which the developers would lease the movie theater space to a newly formed entity affiliated with Freed, and Muvico would manage the theater. The bank would not approve this arrangement because, it asserted, the new lease proposal would require substantially greater improvements than the developers could fund. On October 1, 2009, the developers presented to the bank a revised Muvico arrangement that did not include participation by the Freed entity, but the bank again informed the developers that the

terms of this agreement were not acceptable due to several issues, including the increased tenant improvement allowance and the reduced rent.

On October 19, 2009, plaintiff filed a mortgage foreclosure complaint in the circuit court of Cook County. Three days later, on October 22, 2009, plaintiff filed an emergency motion for appointment of a receiver. On October 26, 2009, defendants filed a motion to dismiss the mortgage foreclosure complaint, pursuant to section 2-619(a)(9) of the Illinois Code of Civil Procedure (735 ILCS 5/2-619(a)(9) (West 2006)) and separately filed a response opposing the plaintiff's motion seeking the appointment of a receiver. The defendants' motion to dismiss was based on their argument that the plaintiff's claim for foreclosure was barred by the affirmative defenses of laches, unclean hands, and equitable estoppel in the defendants' answer, which they also filed on October 26, 2009. On October 28, 2009, pursuant to section 2-619(a)(9), plaintiff filed a motion to strike the defendants' affirmative defenses on the grounds that those defenses were barred by the parties' letter agreements and were legally insufficient.

In their response to plaintiff's motion to appoint a receiver, defendants argued that a receiver should not be appointed, because pursuant to section 15-1702(a) of the Foreclosure Law (735 ILCS 5/15-1702(a) (West 2006)), plaintiff failed to establish that there is a reasonable probability that it will prevail on a final hearing of the cause since there has not been a default on the loan. Further, defendants asserted that plaintiff had not demonstrated good cause for appointment of a receiver and that, in fact, there was good cause not to appoint a receiver, because defendants were in the best position to preserve the value of Block 37 and the appointment of a receiver, at such a late date, would cause significant delays that would

irreparably harm the project. Lastly, defendants asserted that the proposed receiver, Karen Pence Hollan (Hollan) of CB Richard Ellis (CBRE), was not prepared to continue the project, lacked critical understanding of the nature, details and special needs of the project, and had disqualifying conflicts of interest, because CBRE represents other properties in the immediate vicinity of Block 37 that are direct competitors for the pool of tenants seeking to lease space in downtown Chicago and also represents several prospective Block 37 tenants, some of whom were involved in ongoing disputes with the developers.

On November 20, 2009, after hearing arguments, the trial court granted plaintiff's motion to strike defendants' affirmative defenses on the grounds that in the letter agreements, defendants acknowledged that the loan was in default and that they had no defenses. The court also granted plaintiff's motion for appointment of a receiver, finding that the statutory requirements had been met, since the loan documents provide for possession and the defendants admitted default, and further finding that the defendants failed to establish good cause why a receiver should not be appointed.

The trial court's order appointing Hollan of CBRE as the receiver was entered on November 23, 2009, and provided that before the property could be turned over, the receiver would have to post a bond and obtain the necessary insurance, referred to as an ownership controlled insurance program (OCIP), which provides insurance for all of the contractors and subcontractors, as well as the developers of the project. On November 23, 2009, defendants filed a motion to stay the appointment of a receiver pending appeal. Because the receiver had not yet posted bond or obtained the necessary insurance, the defendants remained in possession of the

1-09-3523

property. The circuit court subsequently continued the defendants' stay motion several times in order to grant the receiver additional time to obtain insurance. On December 18, 2009, the court continued the stay motion to January 8, 2010, and defendants filed an interlocutory appeal pursuant to Illinois Supreme Court Rule 307(a)(2) (188 Ill. 2d R. 307). On January 25, 2010, defendants filed with this court an emergency motion to stay the trial court's order appointing a receiver. That motion was denied on February 1, 2010.

## II. ANALYSIS

This appeal presents two issues: whether the trial court erred in finding that there was a "reasonable probability" that the plaintiff would prevail in the underlying foreclosure action and whether the defendants presented evidence to establish "good cause" for not appointing a receiver. Both issues are governed by the Foreclosure Law. Prior to the enactment of the Foreclosure Law and consistent with judicial review of injunctive relief generally, Illinois statutory provisions relating to mortgage foreclosures granted a court discretion to award a mortgagee possession during the pendency of the foreclosure proceedings. However, the Foreclosure Law, enacted in 1987, employs mandatory language and drastically curtails a trial court's discretion in deciding motions to appoint a receiver. Mellon Bank, N.A. v. Midwest Bank & Trust Co., 265 Ill. App. 3d 859, 867 (1993). Section 15-1701(b)(2) of the Foreclosure Law provides that in mortgage foreclosure cases involving nonresidential real estate, a mortgagee is entitled to be placed in possession of the property prior to the entry of a judgment of foreclosure upon request, provided that the mortgagee shows (1) that the mortgage or other written instrument authorizes such possession and (2) that there is a reasonable probability that the mortgagee will prevail on a

1-09-3523

final hearing of the cause.  However, if the mortgagor objects and demonstrates "good cause," the court shall allow the mortgagor to remain in possession.  735 ILCS 5/15-1701(b)(2) (West 2006).

Section 15-1702(a) of the Foreclosure Law provides that "[w]henever a mortgagee entitled to possession so requests, the court *shall* appoint a receiver" (emphasis added) (735 ILCS 5/15-1702(a) (West 2006)) and according to section 15-1105 of the Foreclosure Law, " 'shall' " means "mandatory and not permissive" (735 ILCS 5/15-1105(b) (West 2006)).  Therefore, as this court has previously held, the Foreclosure Law creates a presumption in favor of the mortgagee's right to possession of nonresidential property during the pendency of a mortgage foreclosure proceeding.  Travelers Insurance Co. v. La Salle National Bank, 200 Ill. App. 3d 139, 143 (1990); Mellon, 265 Ill. App. 3d at 866-67 (1993), and a mortgagor can retain possession only if it can show "good cause" for permitting it to do so.  With this in mind, we consider whether the trial court properly granted plaintiff's motion to appoint a receiver.

A. Standard of Review

The first issue we must address is the standard of review for trial court orders granting a motion to appoint a receiver.  Plaintiff, relying on Asset Guaranty Reinsurance Co. v. American National Bank & Trust Co., 254 Ill. App. 3d 713 (1993), asserts that a "trial court's decision not to appoint a receiver should not be reversed unless it is found to be an abuse of discretion."  Asset Guaranty, 254 Ill. App. 3d at 719, citing De Kalb Bank v. Purdy, 166 Ill. App. 3d 709, 716 (1988).  Our supreme court reached a similar conclusion in People ex rel. Scott v. Pintozzi, 50 Ill. 2d 115 (1971), holding that "[t]he appointing of a receiver is an exercise of equity jurisdiction and rest largely in the discretion of the appointing court."  Pintozzi, 50 Ill. 2d at 123.  However, as

this court noted in <u>Asset Guaranty</u>, and explained more fully in <u>Mellon</u>, the Foreclosure Law "severely circumscribe[d] the [appointing court's] exercise of that discretion, as it directs the court to appoint a receiver whenever 'a mortgagee entitled to possession so requests.' " <u>Asset Guaranty</u>, 254 Ill. App. 3d at 719; <u>Mellon</u>, 265 Ill. App. 3d at 868. In <u>Mellon</u>, this court reasoned that as a result of these statutory changes, "we do not believe the [Foreclosure Law] contemplates a deferential standard. *** [W]e believe our review in this appeal is *de novo*, not deferential." <u>Mellon</u>, 265 Ill. App. 3d at 868.

In <u>People v. Vincent</u>, 226 Ill. 2d 1 (2007), our supreme court considered the appropriate standard of review for section 2-1401 petitions (735 ILCS 5/2-1401 (West 2006)). In doing so, the court looked at its prior decision that "a section 2-1401 petition 'invokes the equitable powers of the court, as justice and fairness require.' " <u>Vincent</u>, 226 Ill. 2d at 15, quoting <u>Elfman v. Evanston Bus Co.</u>, 27 Ill. 2d 609, 613 (1963). The court noted that this statement was accurate "when such relief was available under the common law writs. *** When the legislature abolished the writs in favor of today's statutory remedy, it became inaccurate to continue to view the relief in strictly equitable terms." <u>Vincent</u>, 226 Ill. 2d at 15-16. Further: "Simply put, an abuse of discretion standard of review in cases where either a judgment on the pleadings or a dismissal has been entered does not comport with the usual rules of civil practice and procedure." <u>Vincent</u>, 226 Ill. 2d at 16. The court concluded, "We therefore hold that when a court enters either a judgment on the pleadings or a dismissal in a section 2-1401 proceeding, that order will be reviewed, on appeal, <u>de novo</u>." Vincent, 226 Ill. 2d at 18.

Considering the holding in <u>Vincent</u>, we agree with the reasoning in <u>Mellon</u> and find that

under the Foreclosure Law the proper standard of review is *de novo*. However, we also note that in Mellon, this court stated that "Our conclusion on this matter is even stronger in this case because the trial court, in the previously quoted ruling, made *no* findings of fact in denying Mellon's motion." (Emphasis in original.). Mellon, 265 Ill. App. 3d at 868 Therefore, although we apply a *de novo* standard of review in the instant case, it is foreseeable that in a case in which a trial court has held a full evidentiary hearing on a motion to appoint a receiver, this court could find that an abuse of discretion standard or a manifest weight of the evidence standard would be appropriate to review the lower court's judgmental decision.

### B. Reasonable Probability of Succeeding on the Merits

### 1. Whether There Was a "Proven Default"

On appeal, defendants argue that the trial court erred in finding that there was a reasonable probability that plaintiff would prevail on the underlying foreclosure proceeding because there was no default or "material breach" of the loan agreement. Alternatively, defendants argue that even if there was a default, plaintiffs have no reasonable probability of prevailing because their affirmative defenses defeat plaintiff's claims.

As addressed above, a mortgagee in a foreclosure case involving nonresidential real estate is entitled to be placed in possession of the property if it can establish that the mortgage document authorizes possession and that there is a reasonable probability of success in the underlying mortgage foreclosure case. 735 ILCS 5/15-1701(b)(2) (West 2006). Defendants do not contest that the loan documents authorize the plaintiff to take possession of the property. Section 17 of the mortgage provides that "Upon or at any time after the filing of a complaint to foreclose this

Mortgage, the court in which such complaint is filed shall, upon petition by the Mortgagee, appoint a receiver for the Premises in accordance with the Act." Other provisions of the loan documents contain similar provisions.[1]

Defendants do contest, however, the trial court's finding that the plaintiff has a reasonable probability of succeeding in the underlying foreclosure action. This court has held that a proven default establishes a reasonable probability of succeeding in the mortgage foreclosure action. Brown County State Bank v. Kendrick, 140 Ill. App. 3d 538, 541 (1986) citing Olympic Federal v. Witney Development Co., 113 Ill. App. 3d 981, 986 (1983); Mellon, 265 Ill. App. 3d at 868. Further, in Mellon, this court held that "[w]hether a default in fact exists will typically turn on the interpretation of documentary evidence-a non-discretionary function." Mellon, 265 Ill. App. 3d at 868 (finding that affidavit from mortgagee's vice president stating that mortgagor failed to pay real estate taxes, that there were mechanics liens on property and that mortgagee had not been reimbursed for its payment to bondholders of principal and interest rendered mortgagee in default).

Plaintiff contends, and the trial court agreed, that there were two events of default entitling the mortgagee to possession. First, plaintiff asserts, a default occurred when the loan

---

[1] Section 12.1(a) of the loan agreement provides, in part, "Upon the occurrence and during the continuance of any Event of Default *** Agent*** may, and at the direction of the Required Banks shall *** [t]ake possession of the Premises and complete the construction ***." Section 17 of the mortgage states that "At any time after an Event of Default under this Mortgage has occurred and is continuing, the Mortgagors shall, upon demand of the Mortgagee, surrender to the Mortgagee possession of the Premises."

became out of balance by $26 million in March 2008 and ultimately, by as much as $42,600,000, and defendants failed, as required by the loan agreement, to make a balancing deposit within 90 days. Second, plaintiff contends that the loan is in default because the guarantors did not hold unencumbered liquid assets of at least $5 million, as required by the loan agreement. Plaintiff asserts that the defendants admitted to these events of default, first in the March 28, 2008, letter agreement and in each subsequent letter agreement. For instance the August 28, 2008, letter agreement provides, in part:

"Circumstances exist which constitute Events of Default under the Loan

Documents, including, without limitation the following:

1. The fact that the Loans are not In Balance because the costs to complete

the Improvements are greater than the amounts set forth in the Project Budget

attached to the Loan Agreement by at least approximately $26,000,000 and the

Borrowers have not made a balancing deposit in order to place the Loans In

Balance as required by Section 7.4 of the Loan Agreement.

2. Laurance H. Freed and DDL LLC do not have combined unencumbered,

unrestricted Liquid Assets of not less than $5,000,000 as is required by Section

9 of the Guaranty. Compliance with that requirement of the Guaranty is a

condition of the Loans and of the Loan Agreement under Section 8.20 of the Loan

Agreement.

The two specific Events of Default referred to above are hereinafter referred to as '**Specific Defaults**.' "

The language in each of the subsequent letter agreements is substantially the same except that the amount by which the loans are not in balance continued to increase. Each letter agreement stated that the borrowers' defaults constituted "Events of Default" under the loan agreement, that the lenders have the right to make the advances under the provisions of the loan documents but that, in making such advances, the lenders do not waive the specific defaults or any other events of default under the loan documents and do not waive any right to exercise any other rights or remedies available under the loan documents.

Section 7.4 (d) of the loan agreement provides, in part, that "Borrowers agree that if for any reason the Loans are not In Balance, Borrowers, within 10 days after request by Agent, will deposit with Agent cash in an amount which will place the Loans In Balance ***." Under section 11.1(k) of the loan agreement, an out-of-balance condition cannot become an "Event of Default" unless it continues for 90 days after the date that the bank requested a balancing deposit, pursuant to section 7.4(d). Plaintiff asserts that pursuant to the March 28, 2008, letter agreement, defendants received notice that the loans were not in balance and that because they had not made a payment by August 28, 2008, more than 90 days later, the default had become and event of default. Further, plaintiff asserts that on October 8, 2009, after efforts to restructure the loan had failed, the bank sent notice to the defendants declaring the loan due in the principal amount of $128,548,511.87, plus accrued interest and other amounts payable under the loan agreement and

mortgage.

Defendants assert that there was no default because the loan imbalance never ripened into an "event of default." Defendants assert that since the bank never asked them to make a balancing deposit, as required by Section 7.4(d) of the loan agreement, no event of default occurred. Further, defendants assert, the letter agreements confirming that the loans were not in balance does not relieve the bank of its contractual obligations under the loan agreement to request a balance payment in order to trigger section 11(k)'s 90-day cure period.

We disagree. The letter agreements, beginning in March 2008, clearly state that the loan was not in balance and that this constitutes an "event of default" under the loan documents. Subsequent letters also state that the failure of the guarantors to maintain $5,000,000 in liquid assets also constitute an event of default. Defendants were aware that the loan was increasingly out of balance when they signed subsequent letter agreements. Defendants' plain acknowledgment in the letter agreements that the loan was not in balance and that the guarantors had failed to maintain $5 million in liquid assets rendered the mortgage in default.

We also disagree with defendants' contention that even if the loan imbalance were an event of default under the loan agreement, it would not constitute a "material breach" entitling the bank to foreclose. The amount by which the loan was "out of balance" exceeded $42 million on a loan with a maximum principal amount of $205,000,000. Such an amount, particularly in light of the fact that defendants have presented no evidence that they will be able to obtain the funds to put the loan back in balance, constitutes a material breach.

1-09-3523

Based on the record before us, we find that because the loan was out of balance and defendants did not make a deposit that would put the loan back in balance, and because the guarantors failed to maintain $5 million in liquid assets, there was a default under the loan agreement, and the defendants were aware of the default as evidenced by the 23 letter agreements that they signed between March 28, 2008, and August 25, 2009.

### 2. Whether Trial Court Erred in Striking Affirmative Defenses

Next, defendants assert that even if the loan was in default, the bank has no reasonable probability of prevailing in the underlying cause because of the affirmative defenses they raised in the lower court defeat plaintiff's claims. On appeal, defendants contend that the trial court erred in striking their affirmative defenses and that if the court had properly considered them, it would not have granted plaintiff's motion for the appointment of a receiver. Before addressing these arguments, we must first determine whether we have jurisdiction to decide whether the trial court erred in dismissing defendants' affirmative defenses.

Along with its reply brief, plaintiff simultaneously filed a motion to strike this part of defendants' appeal, arguing that Supreme Court Rule 307 (188 Ill. 2d R. 307) limits this interlocutory appeal to the trial court's order appointing a receiver, and that its order dismissing defendants' affirmative defenses cannot be addressed by this court. Plaintiffs further alleged that defendants did not identify in their notice of appeal the trial court's order dismissing their affirmative defenses as an order subject to review on this appeal as required by Illinois Supreme Court Rule 303(b)(2) (210 Ill. 2d R. 303(b)(2)).

-16-

1-09-3523

Illinois Supreme Court Rule 303(b)(2) states that a notice of appeal "shall specify the judgment or part thereof or other orders appealed from and the relief sought from the reviewing court." 210 Ill. 2d R. 303(b)(2). The rule gives the appellant the option of naming either the entire judgment or only a part of the judgment, as the subject of his or her appeal. 210 Ill. 2d R. 303(b)(2). Once the judgment or part is named, the "notice of appeal confers jurisdiction on a court of review to consider only the judgments or parts thereof specified in the notice." People v. Smith, 228 Ill. 2d 95, 104 (2008). However as our supreme court held in Smith, "while a notice of appeal is jurisdictional, it is generally accepted that such a notice is to be construed liberally." Smith, 228 Ill. 2d at 104. Therefore, the court created an exception and held that a reviewing court should find that a defect in a notice of appeal is not fatal to the appeal if (1) the defect is in form rather than in substance; and (2) the defect has not prejudiced the opposing party. Smith, 228 Ill. 2d at 105.

However, as this court noted in Filliung v. Adams, 387 Ill. App. 3d 40 (2008), nearly 30 years before Smith, our supreme court recognized another exception to Rule 303(b)(2)'s requirement to name the "judgment or part," for rulings that were necessary steps to the judgment named in the notice. Burtell v. First Charter Service Corp., 76 Ill. 2d 427, 436 (1979). In Burtell, the court held that an unspecified judgment was reviewable if the specified judgment "directly relates back to [it]." Burtell, 76 Ill. 2d at 434. Applying this reasoning to the facts of the case before it, the court held that the unspecified "decree finding the existence of a joint venture was but a preliminary determination necessary" to the judgment named in the notice, which was "a money judgment based on an accounting." Burtell, 76 Ill. 2d at 436 (where a second trial court

-17-

found that the first trial court was wrong, the first erroneous order led to the second correct one).

In Filliung, this court noted that although Smith mentioned Burtell, there was some doubt whether the "necessary step" exception survived Smith. Filliung, 387 Ill. App. 3d at 49. However, this court found that the exception still stands, because if our supreme court intended to overturn an exception of such long standing, we assume that it would have done so explicitly. Filliung, 387 Ill. App. 3d at 50, citing Barry v. Retirement Board of the Firemen's Annuity & Benefit Fund, 357 Ill. App. 3d 749, 763 (2005). We find that the exception applies in this case. In its order appointing a receiver, the trial court held that plaintiffs had a reasonable probability of success, in part, because defendants had acknowledged their default in the 23 letter agreements. Striking defendants' affirmative defenses, some of which argued that the letter agreements were invalid, was a necessary step to finding that plaintiff had a reasonable probability of success. Therefore, we have jurisdiction to address the trial court's order dismissing defendants' affirmative defenses.

Defendants first contend that the circuit court erred in striking their affirmative defenses based on plaintiff's section 2-619(a)(9) (735 ILCS 5/2-619(a)(9) (West 2006)) motion to dismiss because section 2-619(a)(9) does not apply to affirmative defenses. Defendants contend that the trial court should have either denied the plaintiff's section 2-619(a)(9) motion or should have treated it like a section 2-615 motion (735 ILCS 5/2-615) (West 2006)), admitting all well-pleaded facts in the affirmative defense. The court should not have simply struck the affirmative defenses without addressing the allegations contained therein, defendants assert. Defendants cite Federated Equipment & Supply Co. v. Miro Mold & Duplicating Corp., 166 Ill. App. 3d 670

(1988), for support, wherein this court stated that "We have seen no authority suggesting that section 2-619 may be utilized by a plaintiff as in this case. If considered as a motion to strike an affirmative defense brought under section 2-615, although wrongly labeled [citation], the motion would admit all well-pleaded facts constituting the defense [citations] and would raise only a question of law as to the legal sufficiency of the pleading [citation]." Federated Equipment, 166 Ill. App. 3d at 677.

The record shows that the trial court ordered the defendants' affirmative defenses stricken based on the defendants' acknowledgment in the 23 letter agreements that they were in default on the loan and that they had no defenses. Therefore, regardless of whether the motion had been treated as a section 2-619 motion or a section 2-615 motion, because the trial court found that defendants had affirmatively waived all of their defenses, the court did not err in striking their affirmative defenses.

Defendants also assert, pursuant to section 2-602 of the Illinois Code of Civil Procedure (735 ILCS 5/2-602 (West 2006)), that a plaintiff must file a reply to any new matters raised by a defendant's answer, and a plaintiff is deemed to admit well-pleaded facts alleged in support of any new matters it does not specifically deny. Lundberg v. Gage, 22 Ill. 2d 249, 251 (1961). Defendants contend that because the plaintiff did not file a reply disputing their affirmative defenses, the trial court should have accepted them as true and found that there was not a reasonable probability that plaintiff would prevail in its foreclosure action. Defendants rely on First Federal Savings & Loan Ass'n of Chicago v. National Boulevard Bank of Chicago, 104 Ill. App. 3d 1061 (1982), for support. In First Federal, a bank filed a foreclosure complaint on

1-09-3523

mortgaged property that was still under construction. Defendants answered and asserted several affirmative defenses. Plaintiffs filed no reply to the affirmative defenses but instead moved to be put in possession of the premises. In affirming the trial court's order denying plaintiff possession and appointing a receiver, this court held that since plaintiff filed no reply to the affirmative defenses, "they stand admitted." First Federal, 104 Ill. App. 3d at 1062.

Defendants' reliance on First Federal is misplaced, however, because in that case this court upheld the trial court's denial of a mortgagee's request to be placed in possession because the mortgagee had not replied to the defendant's affirmative defenses and had "not contested the sufficiency of these defenses," which were therefore deemed admitted. First Federal, 104 Ill. App. 3d at 1063. As a result, there was no reasonable probability that the mortgagee would succeed in the underlying cause.

Conversely, in the instant case, plaintiff did contest the affirmative defenses by filing its motion to dismiss, and therefore, those defenses do not stand admitted. Further, as plaintiff argues, it would have made little procedural sense for it to file both a motion to dismiss and an answer at the same time because "the two forms of pleadings are inapposite." Tyler v. J.C. Penney Co., 145 Ill. App. 3d 967, 972 (1986). Plaintiff's decision to file a motion to dismiss did not preclude it from subsequently filing an answer Trusler v. Sears, Roebuck & Co., 125 Ill. App. 3d 325, 328 (1984) (holding that "[u]nless the defendant elects to stand on its motion to dismiss, it retains the right to file an answer"), and although a motion to dismiss admits all facts well pleaded, it does so only for the limited purpose of determining the motion. Trusler, 125 Ill. App. 3d at 328.

-20-

Next, we address defendants' contention that the trial court erred in finding that plaintiff's affirmative defenses are barred by the 23 letter agreements. The letter agreements specifically state that the "Borrowers and Guarantors hereby *** represent, warrant, acknowledge and agree that they do not have any defense, set-off or counterclaim to the payment or performance of any of their obligations under the Loan Documents ***." In striking the defendants' affirmative defenses, the trial court relied on that language in finding that defendants "acknowledge on several occasions that they do not have defenses."

In affirming the trial court order striking defendants' affirmative defenses, first we note that a decision by a party to contractually agree to waive all defenses is permitted under Illinois law. See, e.g., BA Mortgage & International Realty Corp. v. American National Bank and Trust Co. of Chicago, 706 F. Supp. 1364, 1376 (N.D. Ill. 1989) ("[w]hen [waivers in a guaranty] are clear and unambiguous, Illinois courts consistently enforce them"); Kolson v. Vembu, 869 F. Supp. 1315 (N.D. Ill. 1994) (holding that a clause in a guaranty agreement, whereby corporate guarantor waived all defenses, counterclaims and setoffs was enforceable); Chemical Bank v. Paul, 244 Ill. App. 3d 772, 781 (1993) ("[g]uaranty agreements containing waivers of all defenses *** have been upheld as validly binding"). Therefore, defendants were not precluded from entering an agreement waiving their defenses, and this court is not precluded from upholding it.

Next, we disagree with defendants' assertion that they were induced into signing the letter agreements, rather than looking for funding from an outside source, because they were under the belief, based on their ongoing negotiations with the bank, that the loan would be modified. A case closely aligned with the instant case is Teachers Insurance & Annuity Ass'n of America v. La

-21-

1-09-3523

Salle National Bank, 295 Ill. App. 3d 61, 70 (1998). In Teacher's Insurance, a lender holding a mortgage on commercial property filed a foreclosure action against the borrowers. Teachers Insurance, 295 Ill. App. 3d at 65. In the months before the complaint was filed, the defendants had informed the lender that its primary tenant was not going to renew its lease, and therefore, the loan needed to be restructured. The parties subsequently engaged in periodic discussions regarding restructuring the loan, but never executed a written restructuring agreement. Teachers Insurance, 295 Ill. App. 3d at 64. After the plaintiff filed its complaint, the defendants raised several affirmative defenses and counterclaims, including breach of contract, unclean hands, fraud, and estoppel, arising from the bank's refusal to comply with the terms of the parties' alleged oral agreement to restructure the loan. Defendants also asserted that as a result of the bank's refusal to follow through on the alleged oral agreement to restructure the loan, they lost two large leases. The trial court granted plaintiff's motion for a summary judgment on defendants' affirmative defenses and counterclaims on the grounds that they were barred by the Credit Agreements Act (now see 815 ILCS 160/0.01 et seq. (West 2006)). Teachers Insurance, 295 Ill. App. 3d at 65-66.

On appeal, defendants argued that the trial court erred in holding that the Credit Agreements Act barred defendants' affirmative defenses and counterclaims. Teachers Insurance, 295 Ill. App. 3d at 66. This court affirmed the trial court, noting that it was undisputed that the written credit agreement did not require the plaintiff to restructure the loan and that because all of the defendants' counterclaims and affirmative defenses were based on plaintiff's alleged conduct in reneging on the parties' alleged oral agreement to restructure the loan, they were barred by

section 3 of the Credit Agreements Act, which required that agreements to modify an existing credit agreement be in writing. Teachers Insurance, 295 Ill. App. 3d at 70. Further, this court stated that it would not extend the duty of good faith and fair dealing, which is implied in every contract as a matter of law, to a purported oral credit agreement. Teachers Insurance, 295 Ill. App. 3d at 74. See also, Bank One, Springfield v. Roscetti, 309 Ill. App. 3d 1048, 1060 (1999) (holding that the covenant of good faith and fair dealing, which applies to every contract, does not enable a guarantor to read an obligation into a contract that does not exist).

Similarly, in this case, despite the parties' ongoing discussions, the loan agreement did not require the plaintiff to modify the loan. Further, as this court held in Teachers Insurance, the oral discussions between the parties do not give rise to a defense and cannot be the basis for an argument that the lender failed to abide by a duty of good faith and fair dealing. Therefore, we find that the parties' oral negotiations regarding a possible restructuring of the loan agreement are not grounds for reversing the trial court's decision to strike defendants' affirmative defenses.

Lastly, we address defendants' assertion that they acted under economic duress in entering into the letter agreements and thus waiving their defenses. Economic duress, also known as business compulsion, is an affirmative defense to a contract, which releases the party signing under duress from all contractual obligations. Herget National Bank of Pekin v. Theede, 181 Ill. App. 3d 1053, 1057 (1989). Duress occurs where one is induced by a wrongful act or threat of another to make a contract under circumstances that deprive one of the exercise of one's own free will. Hurd v. Wildman, Harrold, Allen & Dixon, 303 Ill. App. 3d 84, 91 (1999), citing De Fontaine v. Passalino, 222 Ill. App. 3d 1018, 1029 (1991); Kaplan v. Kaplan, 25 Ill. 2d 181, 185

(1962). To establish duress, one must demonstrate that the threat has left the individual " ' "bereft of the quality of mind essential to the making of a contract." ' " Hurd, 303 Ill. App. 3d at 91, quoting Alexander v. Standard Oil Co., 97 Ill. App. 3d 809, 815 (1981), quoting Kaplan, 25 Ill. 2d at 186. The acts or threats complained of must be wrongful; however, the term "wrongful" is not limited to acts that are criminal, tortious, or in violation of a contractual duty. They must extend to acts that are wrongful in a moral sense as well. Hurd, 303 Ill. App. 3d at 91, citing Kaplan, 25 Ill. 2d at 186.

It is well settled that, where consent to an agreement is secured merely through a demand that is lawful or upon doing or threatening to do that which a party has a legal right to do, economic duress does not exist. Hurd, 303 Ill. App. 3d at 91, citing Alexander, 97 Ill. App. 3d at 815. Nor can such a defense be predicated on an allegation that consent to an agreement was obtained through hard bargaining positions or financial pressures. Hurd, 303 Ill. App. 3d at 91, citing Wallenius v. Sison, 243 Ill. App. 3d 495, 503 (1993); Chouinard v. Chouinard, 568 F.2d 430, 434 (5th Cir. 1978).

In this case, defendants allege that they signed the letter agreements because the bank threatened that it would not otherwise continue to fund draws or finalize the loan modification, and because the project would have collapsed without the draws, they signed them under "economic duress." Defendants cite Herget for support. In Herget, the bank obtained a judgment against a defendant after he ceased making payments on a note that he signed consolidating loans that were made to his wife. This court found that defendant established a prima facie case of economic duress and was entitled to a hearing in support, because he signed the note after the

bank led him to believe, falsely, that he was responsible for the loans made to his wife. Herget, 181 Ill. App. 3d at 1057. This case is inapposite, however, because there are no allegations that the bank made false statements to defendants regarding possible modifications of the loan or anything else in order to induce them to sign the letter agreements. Therefore, for our purposes, which is to decide whether the trial court erred in appointing a receiver, we find that defendants have failed to establish "economic duress" simply by alleging that they felt financial pressure to enter into the letter agreements in order to continue the project. For the foregoing reasons, we find that the trial court did not err in dismissing defendants' affirmative defenses.

In this appeal, we are limited to determining whether there was a "reasonable probability" that defendants would succeed in the underlying foreclosure proceeding. Because we find that by signing the letter agreements, the defendants acknowledged that there were two events of default, and that their affirmative defenses were properly stricken by the trial court, we conclude that the trial court did not err in finding that there was a reasonable probability that the plaintiff would succeed in the underlying mortgage foreclosure action.

C. Whether Defendants Established Good Cause Not to Appoint a Receiver

Because we have found that plaintiff has satisfied the requirements under section 15-1701(b)(2) of the Foreclosure Law (735 ILCS 5/15-1701(b)(2) (West 2006)) entitling it to be placed in possession of the property, we must now determine whether defendants established good cause to permit them to retain possession. Defendants raise two "good cause" arguments in this appeal: (1) that they are in the best position to complete the project and protect the value of the collateral, particularly given the project's complexity and the fact that it is in the late stages;

1-09-3523

and (2) that the appointed receiver is unprepared to take over the project and has disqualifying conflicts of interest. We will address each argument in turn.

First, relying on Asset Guaranty, 254 Ill. App. 3d 713, defendants assert that the presence of a responsible manager that can bring the project to completion is good cause under the Foreclosure Law to prevent the appointment of a receiver. In Asset Guaranty, after hearing argument, the trial court decided not to immediately grant the mortgagee's motion for the appointment of a receiver, stating in its memorandum of opinion that, "Inasmuch as there is an on-site management company already managing the property and *** there is an extensive opposition to an appointment of a receiver, this matter is continued for 120 days. At that time, the matter will be reevaluated." Asset Guaranty, 254 Ill. App. 3d at 717. On plaintiffs' interlocutory appeal, this court affirmed the trial court; however, that holding was not based on the current management of the property, but instead on a finding that the mortgagee failed to satisfy the first prong of section 15-1701(b)(2) of the Foreclosure Law by showing that the loan documents entitled it to possession. Asset Guaranty, 254 Ill. App. 3d at 720. As a result, this court concluded, "we need not address the argument that Orleans showed good cause to remain in possession." Asset Guaranty, 254 Ill. App. 3d at 721. Therefore, because Asset Guaranty was decided on other grounds, it does not support defendants' argument that the presence of a responsible manager of the property establishes good cause not to appoint a receiver.

A case more directly on point is Home Life Insurance Co. v. American National Bank & Trust Co., 777 F. Supp. 629 (N.D. Ill. 1991). In Home Life, like the defendants in this case, the defendant argued that there was good cause for not appointing a receiver because there was no

-26-

more qualified manager for the property than the current manager. The district court rejected that argument, stating that "the qualifications of current property management are not an important consideration under the [Foreclosure Law] when the property is in default." Home Life, 777 F. Supp. at 632. "Such a requirement would be tantamount to shifting the burden of showing good cause onto the mortgagee." Home Life, 777 F. Supp. at 632, citing Travelers, 200 Ill. App. 3d at 144. We find that the qualifications of the current management are an insufficient basis to find that there is good cause to permit the mortgagor to retain possession of the subject property.

Defendants next contend that although plaintiff's stated purpose for seeking a receiver was to ensure completion of the project in a prompt and responsible manner, plaintiff has never alleged, much less demonstrated, that defendants were not doing what was necessary to ensure completion of the project. However, under the Foreclosure Law, the mortgagee has no obligation to present such evidence, because this court has held that the burden to establish good cause is on the mortgagor, not on the mortgagee. Travelers, 200 Ill. App. 3d at 143. For instance, in Travelers, defendants executed a mortgage in favor of the plaintiff to secure a promissory note for $15,500,000. Travelers, 200 Ill. App. 3d at 140-41. The mortgaged property included an office building that generated monthly rental income of approximately $150,000. Travelers, 200 Ill. App. 3d at 141. After defendant defaulted on the loan and plaintiff filed a mortgage foreclosure complaint, the parties entered into an agreement, pursuant to which defendants would deposit rents produced by the mortgaged property into a checking account held jointly with plaintiff and submit to plaintiff a monthly schedule identifying proceeds and operating expenses. Travelers, 200 Ill. App. 3d at 141. After the trial court approved the agreement and entered an agreed order

1-09-3523

incorporating its terms, plaintiff decided to file a motion to obtain possession, which the trial court granted after finding that the mortgage authorized possession and that plaintiff was likely to prevail on the merits of the foreclosure complaint. Travelers, 200 Ill. App. 3d at 141.

On appeal, defendants contended that they demonstrated the statutorily required good cause to retain possession because plaintiff failed to allege any fraud, mismanagement, waste or other dissipation of the mortgaged real estate. This court rejected that argument, finding it was "nothing more than defendants' attempt to shift the burden of making a good cause showing onto plaintiff", " which, as a nonresidential mortgagee, "had no obligation to allege misdeeds or omissions on the part of the mortgagors in order to be placed in possession." Travelers, 200 Ill. App. 3d at 144. Therefore, because the defendants failed to demonstrate good cause to overcome the statutory presumption in favor of the mortgagee, this court affirmed the trial court's decision to put plaintiff in possession of the property. Travelers, 200 Ill. App. 3d at 146. Similarly, in this case, the plaintiff had no obligation to either allege or prove that the defendants were not properly managing the property in order to be entitled to possession.

We note, however, that while defendants argue that they are in a better position to complete the project, they do not present a plan to obtain the additional funding required to do that or indicate how they would be able to put the loan back in balance. However, as this court recently held in Centerpoint Properties Trust v. Olde Prairie Block Owner, LLC, No.1-09-1481 (February 10, 2010), there are circumstances in which a court could find that good cause has been established by a mortgagor in a situation similar to the one faced by defendants in this case. For instance, if a mortgagor presents evidence showing that it has a commitment from a lender to

-28-

refinance its loan or from an investor to provide the additional funding needed to complete the project and that appointing a receiver would likely impede the completion of that transaction, a trial court may find that there is good cause to permit the mortgagor to retain possession in the interim. Centerpoint, slip op. at 12. It is likely, however, that a court would find that the transaction must be imminent and not merely a possibility at some unknown time in the future. Centerpoint, slip op. at 12-13 quoting Home Life, 777 F. Supp. at 632 (holding that " '[t]he mere possibility of existing lease negotiations does not overcome the statutory presumption in favor of the appointment of a receiver' ").

In this case, as both parties acknowledge, the loan is out of balance by $42.6 million. Defendants have presented no evidence showing that they have a commitment from a lender or investor to provide funding that would cure the imbalance, and it appears that the bank is the only party in a position to bring the project to completion. Although defendants contend that they and the plaintiff were engaged in ongoing negotiations to increase the principal amount of the loan, as we previously addressed, the plaintiff had no obligation to modify the loan. As a result, we conclude that the trial court did not err in finding that defendants failed to establish good cause for permitting them to retain control of the property on the grounds that they can better manage the property, particularly in light of the statutory presumption in favor of granting possession to a mortgagee of commercial property.

Next, we address defendants' contentions that the actions of the designated receiver, CBRE, provide good cause to permit them to retain possession of the property. Pursuant to section 15-1702(b) of the Foreclosure Law (735 ILCS 5/15-1702(b) (West 2006)), a mortgagee

of nonresidential real estate is entitled to designate a receiver and a court should reject such selection only when the mortgagor objects and shows good cause. Home Life, 777 F. Supp. at 633. Here, defendants allege that they have shown good cause because the designated receiver, Karen Pence Hollan and her firm, CBRE, do not understand the project, have been unable to obtain the necessary insurance for the project, and have disqualifying conflicts of interest. First, with regard to the receiver's alleged failure to understand the project, defendants assert that the receiver has (1) proposed charging a range of leasing commission fees, management fees and development fees, without submitting evidence that those fees are fair and appropriate and without disclosing that they far exceed the fees charged by the developers; (2) submitted a safety plan without disclosing that the plan was a copy of the developers' safety plan, without explaining how the safety plan would be implemented, and without obtaining the insurance that was a necessary component of the safety plan; and (3) submitted a "management plan" that treated Block 37 more like an office building than a retail mall. All of these actions, defendants allege, are evidence that Hollan and CBRE are not qualified to act as a receiver for the project. We disagree.

There is no indication that CBRE is incompetent, inexperienced, or incapable of managing the project and bringing it to completion. The record shows that CBRE is a large real estate services company and that Hollan, CBRE's director of asset services, who has been appointed as receiver, has acted as receiver on 20 other large developments. In addition, CBRE has several staff members with experience in construction and commercial leasing available to work on the project. As a result, we do not find that Hollan's qualifications or the qualifications of CBRE, for

whom she works, constitute good cause not to appoint her as receiver. With regard to the receiver's delay in obtaining insurance for the project, we find that the record shows that the delays were not solely the fault of CBRE and given the complicated transaction were not necessarily unreasonable or unforeseen.

Lastly, defendants assert that the receiver's failure to disclose and resolve disqualifying conflicts of interest render it unfit for the job and constitutes good cause for not appointing it as receiver. Defendants assert that CBRE has represented and continues to represent prospective and current tenants negotiating leases withe Block 37, some of which are involved in ongoing disputes with the developers. In addition, defendants assert, CBRE represents other properties in the immediate vicinity of Block 37 that are direct competitors for the limited pool of retail tenants seeking to lease space in downtown Chicago. We do not disagree but find that because such issues are inherent with large commercial real estate projects, the trial court's decision that such conflicts did not constitute good cause for not appointing a receiver was not in error. This is an issue which is particularly appropriate for the trial court to decide. Even if the court were to find that CBRE should not be appointed as receiver, this does not lead to the conclusion that no receiver should be appointed. Therefore, we find that CBRE's representation of tenants and potential tenants in Block 37 does not constitute good cause under the statute.

### III. CONCLUSION

For the foregoing reasons, we affirm the order of the circuit court.

-31-

1-09-3523

Affirmed.

STEELE and COLEMAN, JJ., concur.