In the

 United States Court of Appeals
 For the Seventh Circuit
 ____________________
No. 22-2081
MICHAEL ROSS,
 Plaintiff-Appellant,
 v.

FIRST FINANCIAL CORPORATE SERVICES, INC., et al.,
 Defendants-Appellees.
 ____________________

 Appeal from the United States District Court for the
 Northern District of Illinois, Eastern Division.
 No. 1:19-cv-01849 — Robert M. Dow, Jr., Judge.
 ____________________

 ARGUED JANUARY 24, 2023 — DECIDED FEBRUARY 24, 2023
 ____________________

 Before HAMILTON, KIRSCH, and JACKSON-AKIWUMI, Circuit
Judges.
 HAMILTON, Circuit Judge. Plaintiﬀ Michael Ross worked as
a sales representative for defendant First Financial Corporate
Services, Inc. until January 2018. Ross ﬁled this suit against
First Financial and two of its senior executives for sales com-
missions he says he is owed. Under the terms of his employ-
ment contract, Ross could earn a commission at two diﬀerent
points: both when a customer ﬁrst leased an equipment item
2 No. 22-2081

from First Financial and then at the end of a lease term, if the
customer either extended the lease or purchased the equip-
ment outright.
 In early 2017, First Financial acted to reduce commission
rates going forward. Ross contends in this suit that First Fi-
nancial breached his contract by applying the new, lower
commission rates to end-of-lease transactions that occurred
after the change took eﬀect if the leases originally began be-
fore the change. The district court granted summary judg-
ment for defendants. 2022 WL 1567128 (N.D. Ill. May 18,
2022).
 We aﬃrm. We agree with the district court that the com-
pany’s commission payments to Ross were correct because
commissions on end-of-lease transactions are not earned until
the customer actually agrees to and pays for the new transac-
tions. Also, even though Ross was reluctant to accept the new
plan, he still accepted it by continuing to work for First Finan-
cial under its terms.
I. Factual and Procedural Background
 Michael Ross was a sales representative for First Financial
Corporate Services, Inc. from 2010 until 2018. The parties
agree that he was an at-will employee. He could leave his job
at any time and for any reason, and First Financial could end
his employment, also at any time and for any reason.
 Ross marketed and leased equipment oﬀered by the com-
pany. Each year he entered into a Sales Employee Agreement
that spelled out the commissions he could earn. Those agree-
ments provided in relevant part:
No. 22-2081 3

 [First Financial] will pay [Ross] monthly for any
 commissions due from transactions that closed
 in the previous month. A closed transaction is
 deﬁned as one where all documentation is com-
 plete and the vendor has been paid, and in those
 cases where debt and/or equity is required, the
 debt and/or equity is placed and all documents
 are completed, and [First Financial] is in receipt
 of the funds.
Note in particular the requirement that the customer have
paid before a commission would be due. Ross earned a com-
mission on the initial leasing of equipment based on the pre-
sent value of the lease and the acquisition costs of the equip-
ment. He could also earn a commission on a “margin transac-
tion” at the end of the original lease term when a customer
could choose to buy the equipment outright or to extend the
lease for another term or on a month-to-month basis. The
commission rates for such “margin transactions” were much
higher than those for the original leases. Also, after Ross met
a sales quota each year, his commission rates increased for
both initial and margin transactions.
 This case concerns margin transactions that closed in 2017
in which customers chose to buy the leased equipment or to
extend their leases. The critical point is that such margin
transactions remained uncertain unless and until the cus-
tomer made its choice and paid for them. Commissions for
margin transactions also became payable only after reaching
a “Threshold,” when the payments received by First Financial
under the lease exceeded an amount to make it proﬁtable for
First Financial.
4 No. 22-2081

 From 2010 through 2016, Ross earned commissions under
a commission plan that provided, on margin transactions,
commissions of 35% before he met his sales quota and 40%
after meeting his quota. That original commission plan pro-
vided that “margin will be credited and paid upon receipt of
the payments from the Lessee based on excess margin above
the Threshold amounts.”
 In early 2017, First Financial acted to cut commission rates
going forward, including for new margin transactions on
leases originating before January 1, 2017. Sales representa-
tives would earn commissions of only 20% of the over-
Threshold earnings on margin transactions they sold before
meeting their sales quotas and 35% after meeting their quotas.
 Ross received the new commission plan on February 14,
2017. The email transmitting the new plan began: “Attached is
the 2017 Sales Commission Plan. Please review and execute
by Friday February 17th; you will not be paid commissions
until this is signed and received by management.” (Bold in
original.) Ross has not based his claim on this threat to with-
hold payment of commissions. Instead, he objected to the
change in commission structure, especially as applied to new
“margin transactions” from leases that had begun under the
older, more generous commission plan. Nevertheless, Ross
reluctantly signed the new plan on February 20, 2017. He con-
tinued working for First Financial until he resigned in Janu-
ary 2018.
 Invoking diversity jurisdiction under 28 U.S.C. § 1332,
Ross sued First Financial in the Northern District of Illinois
claiming he was owed unpaid commissions of about $340,000.
He asserts that on certain margin transactions occurring after
he signed the new commission plan, he should have been
No. 22-2081 5

paid commissions of 35% but was paid only 20%. First Finan-
cial, he insists, breached its contract with him and tried to im-
pose a contract modiﬁcation that should not be enforceable
for lack of consideration.
 On cross-motions for summary judgment, the district
court granted summary judgment for defendants. The court
ruled that First Financial validly modiﬁed Ross’s at-will em-
ployment contract going forward. The court also found that
commissions on new margin transactions were not earned
when the leases ﬁrst started but only when the optional mar-
gin transactions closed at the end of an original lease term.
The court found that Ross was not entitled to any further com-
mission payments for his 2017 margin transactions.
II. Analysis
 We review the district court’s summary judgment ruling
de novo, and because Ross’s claims are governed by Illinois
law, we apply state law as we believe the Illinois Supreme
Court would apply it in this case. Sutula-Johnson v. Oﬃce De-
pot, Inc., 893 F.3d 967, 971 (7th Cir. 2018).
 Prospective or Retroactive Modiﬁcation: Ross’s ﬁrst argument
is that the 2017 commission plan retroactively changed the
calculation of commissions already earned. If that were cor-
rect, that would have been an invalid modiﬁcation of his com-
mission contract without oﬀer, acceptance, and consideration.
Yet Ross concedes and the Illinois case law teaches that if the
2017 change applied only to commissions earned after the
change, then no new or separate consideration would be re-
quired. Ross was an at-will employee. Employers can modify
at-will employment terms, including compensation, if the
change is prospective. An employee can accept such a change
6 No. 22-2081

by merely continuing to work under the new terms, however
reluctantly. Geary v. Telular Corp., 793 N.E.2d 128, 131 (Ill. App.
2003); accord, Sutula-Johnson, 893 F.3d at 972–73 (aﬃrming
summary judgment for employer in relevant part on same
theory).
 The terms of the parties’ contract tell us when Ross earned
commissions on margin transactions. See generally Matthews
v. Chicago Transit Auth., 51 N.E.3d 753, 775–76 (Ill. 2016) (de-
scribing principles for interpreting contracts, including em-
ployment contracts). Ross’s employment agreement said that
commissions were earned for “closed transactions,” deﬁned
as transactions “where all documentation is complete and the
vendor has been paid … and [First Financial] is in receipt of
the funds.”
 Under this deﬁnition, a margin transaction at the end of a
lease term simply cannot be deemed to have been a “closed
transaction” at the origination of a lease. When a lease term
ends, a customer is entitled to choose to allow it to end and to
return the leased equipment without making any further pay-
ments. A margin transaction occurs, and thus generates reve-
nue and yields a commission, only if the customer exercises
one of the other options (extend the lease or buy the equip-
ment) and makes the additional payment. The transaction
could not reasonably be deemed to have “closed” until after
the end of the original lease—not at its inception, as Ross ar-
gues.
 This reasoning is consistent with the written terms of the
commission plans. The plans from 2010 to 2016 said that the
“margin will be credited and paid upon receipt of the pay-
ments from the Lessee based on excess margin above the
Threshold amounts.” The 2017 plan language changed
No. 22-2081 7

slightly to say that commission “will be paid based on receipt
of any monthly rental paid by the original lease customer past
the base term of the lease and those rents collected resulting in
excess margin above Threshold.” In both cases, the plans
speciﬁed that commissions on margin transactions would be
paid only after First Financial received funds that exceeded
the payments on the original lease. Such commissions could
not be “earned” at the outset of the original lease.
 As Judge Dow explained in the district court, “margin
transactions are optional for a lessee” who may “opt to simply
return the equipment, which would not generate any addi-
tional revenue for First Financial—and correspondingly, no
additional commission” for Ross. 2022 WL 1567128 at *5; ac-
cord, Geary, 793 N.E.2d at 132–33 (ﬁnding a sale was not com-
plete and did not entitle plaintiﬀ to commissions when sale
was still contingent on further eﬀorts and negotiations). The
district court was correct: Ross “earn[ed] commissions for
margin transactions, if ever, when the margin transaction is
completed, not months or often years prior, when the lease is
originated.” 2022 WL 1567128 at *6. As a result, the 2017 plan
commission rates for margin transactions that occurred in
2017 were not retroactive and required no new or separate
consideration. See Geary, 793 N.E.2d at 131–32 (aﬃrming
summary judgment for employer who reduced commissions
going forward).
 Acceptance: The remaining issue is whether Ross accepted
the new 2017 commission plan to modify the terms of his con-
tract with First Financial. See Cox v. U.S. Fitness, LLC, 2 N.E.3d
1211, 1218 (Ill. App. 2013) (valid modiﬁcation of contract
“must satisfy all criteria for a valid enforceable contract, in-
cluding oﬀer, acceptance and consideration”), quoting
8 No. 22-2081

Hannafan & Hannafan, Ltd. v. Bloom, 959 N.E.2d 1280 (Ill. App.
2011). Ross argues that his signature on the 2017 commission
plan was not a valid acceptance because he disagreed with the
new commission structure and felt he had no choice but to
sign it.
 This view is not consistent with Illinois law. “When an at-
will employee continues to work after a change in commis-
sion plan, he is deemed to have accepted the change.” Geary,
793 N.E.2d at 131, citing Schoppert v. CCTC International, Inc.,
972 F. Supp. 444, 447 (N.D. Ill. 1997). Ross continued to work
for First Financial until he resigned in 2018. His continued
work, whether he was enthusiastic or reluctant, established
his acceptance of the new plan. Sutula-Johnson, 893 F.3d at
972–73.
 As noted above and during the oral argument, First Finan-
cial sent the new, lower commission plan for 2017 with an
email that said that Ross would not be paid commissions until
he signed the new commission plan. First Financial could law-
fully have told Ross, as an at-will employee, that he would be
ﬁred if he did not accept the new commission plan. E.g.,
Schoppert, 972 F. Supp. at 447. But that’s not what First Finan-
cial said. Instead, it threatened not to pay him until he agreed,
and that particular threat had teeth only if Ross had already
earned commissions for which he had not yet been paid.
 Such a threat to refuse to pay sums that Ross had already
earned seems diﬃcult to reconcile with Illinois law. See 820
Ill. Comp. Stat. 115/3 (requiring employers to pay earned com-
missions at least monthly), and 115/14 (criminal penalties and
civil remedies for failure to pay earned “wages” as deﬁned in
115/2 to include commissions). As a general rule, unlawful
conduct renders voidable a contract secured through that
No. 22-2081 9

conduct. See Alexander v. Standard Oil Co., 423 N.E.2d 578,
582–83 (Ill. App. 1981) (discussing issue in terms of duress);
see also Bank of America, N.A. v. 108 North State Retail LLC,
928 N.E.2d 42, 57 (Ill. App. 2010) (unlawful threats may show
duress, but lawful demand or threat to do what actor has legal
right to do does not show duress). Ross has not made any ar-
gument on this basis, however, and we will not speculate
about his reasons. We note the point, however, because this
opinion should not be understood as approving such a threat
by an employer.
 AFFIRMED