2022 IL App (2d) 210166-U
No. 2-21-0166
Order filed November 23, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| McCORMICK 106, LLC, | ) | Appeal from the Circuit Court |
| | ) | of Winnebago County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 19-CH-164 |
| | ) | |
| LOUIS CAPRA; LOUIS CAPRA & | ) | |
| ASSOCIATES, LLC; THE ALPINE | ) | |
| CONDOMINIUM OWNER'S | ) | |
| ASSOCIATION; MIDWEST COMMUNITY | ) | |
| BANK; CITY OF ROCKFORD; | ) | |
| ROCKFORD STOP-N-GO; UNKNOWN | ) | |
| OWNERS and NON- RECORD | ) | |
| CLAIMANTS, | ) | |
| | ) | |
| Defendants | ) | |
| | ) | Honorable |
| (Louis Capra and Louis Capra & Associates, | ) | Donna R. Honzel, |
| LLC, Defendants-Appellants). | ) | Judge, Presiding. |

PRESIDING JUSTICE BRENNAN delivered the judgment of the court.
Justices Jorgensen and Schostok concurred in the judgment.

**ORDER**

¶ 1    *Held*: Mortgagor of nonresidential real estate defaulted on mortgage contract by failing to make final payment on due date. Mortgagor's allegations failed to allege material breach, thus the trial court did not err when it appointed a receiver over his objection. The receiver did not owe mortgagor a fiduciary duty, thus the trial court did not err when it denied the request to remove the receiver and granted the

receiver's motion to dismiss the third-party complaint against him. Because the alleged breaches were not material, the trial court did not err when it granted summary judgment for mortgagee. Further, the trial court did not abuse its discretion when it confirmed the judicial sale of properties. Affirmed.

¶ 2     In this mortgage foreclosure proceeding, the mortgagors, Louis Capra and Louis Capra & Associates, LLC[1] (Capra), appeal numerous rulings entered in the trial court: (1) an order placing McCormick 106, LLC, the mortgagee, in possession of the real property and appointing a receiver; (2) an order denying Capra's request to remove the receiver and dismissing his third-party complaint against the receiver; (3) an order granting McCormick 106 summary judgment; and (4) an order confirming the judicial sale of the remaining properties. For the reasons that follow, we affirm all of the challenged orders.

¶ 3                              I. BACKGROUND

¶ 4     In 2008, Capra executed a real estate mortgage contract with Northwest Bank of Rockford to purchase six parcels of nonresidential real property, which were secured by a blanket mortgage. McCormick 106 acquired the contract in May 2018 and filed a complaint for foreclosure in March 2019.

¶ 5                       A. The Foreclosure Complaint

¶ 6     The foreclosure complaint listed five properties (the sixth was sold prior to the filing of the complaint): (1) 3208 South Alpine Road (South Alpine), (2) 5811-5861 Forest Hills Road (Forest Hills), (3) 3392-3430 Lonergan Drive (Lonergan), (4) 4815 Creekview Road (Creekview 1), and

---

[1]McCormick 106 states that Louis Capra is the sole member of Louis Capra & Associates, LLC. It is unclear from the record whether there are any other members of Louis Capra & Associates, LLC, and the appellant's brief simply refers to appellants collectively as "Capra." We do the same.

(5) 4830 and 4836 Creekview Road (Creekview 2). McCormick 106 attached to the complaint copies of the original September 2008 mortgage contract with Northwest Bank of Rockford; the November 25, 2017, renewal notes; and the assignment of mortgage to McCormick 106. Loan No. 19798 (Note A) was for the principal amount of $4,800,000. Loan No. 19799 (Note B) was for the principal amount of $2,105,499.38. Notes A and B both had a maturity date of January 5, 2019. The notes each provided that an "Event of Default" would occur if "Borrower fails to make any payment when due under this Note." The payment terms for Note A were as follows:

"Borrower will pay this loan in 12 regular payments of $28,060.00 each and one irregular last payment estimated at $4,731.669.94. Borrower's first payment is due January 6, 2018, and all subsequent payments are due on the same day of each month after that. Borrower's final payment will be due on January 5, 2019, and will be for all principal and all accrued interest not yet paid. Payments include principal and interest. Unless otherwise agreed or required by applicable law, payments will be applied first to any unpaid collection costs; then to any late charges; then to any escrow or reserve account payments as required under any mortgage, deed of trust, or other security instrument or security agreement securing this Note; then to any accrued unpaid interest; and then to principal. ***."

Note A provided, under the heading "HISTORY OF CHANGE IN TERMS":

"This note originally dated 9/25/08 in the amount of $4,140,720 with a maturity date of 09/25/13; references all extensions, modifications, renewals, and substitutions of such promissory note and a related mortgage of even date in the amount of $7,668,000 and recorded as document #200800846589 in the county of Winnebago, IL. The note was subsequently modified and amended as follows: modified to an amount of $6,464,000 and extended to a new maturity date of 9/25/15, [extended on multiple occasions], and extended

to a new maturity date of 11/25/17. This note is now being extended to a new maturity date of 1/5/19 and modified to a new loan amount of $4,800,000. Prior secondary accrued interest on the existing note #19798 through November 25, 2017 in the amount of $83,673.45 is herein transferred to Note #19799, and will [be] due and payable under the amended terms and conditions of that note (19799) renewal dated November 25, 2017."

The payment terms for Note B were as follows:

"Borrower will pay this loan in one principal payment of $2,105,499.38 plus interest on January 5, 2019. The payment due on January 5, 2019, will be for all principal and all accrued interest not yet paid. Payments include principal and interest. Unless otherwise agreed or required by applicable law, payments will be applied first to any unpaid collection costs; then to any late charges; then to any escrow or reserve account payments as required under any mortgage, deed of trust, or other security instrument or security agreement securing this Note; then to any accrued unpaid interest; and then to principal. ***."

Note B provided, under the heading "HISTORY OF CHANGE IN TERMS":

"This note originally dated 9/25/08 in the amount of $3,527,280 with a maturity date of 11/25/13; references all extensions, modifications, renewals, and substitutions of such promissory note and a related mortgage of even date in the amount of $7,668,000 and recorded as document #200800846589 in the county of Winnebago, IL. The note was subsequently modified and amended as follows: modified to an amount of $930,146.93 and extended to a new maturity date of 9/25/15, [extended on multiple occasions], and extended to a new maturity date of 11/25/17. This note is now being extended to a new maturity date of 1/5/18 and modified to a new loan amount of $2,105,499.38. Prior

secondary accrued interest on the existing note #19799 through November 25, 2017 in the amount of $12,013.75, along with the transferred accrued interest from note #19798 through November, 25, 2017 in the amount of $83,673.45, will be due and payable under the amended terms and conditions of the note renewal dated November 25, 2017."

¶ 7 According to the complaint, Capra purchased the properties from Northwest Bank in 2008 in exchange for a promissory note secured by a mortgage. Capra then executed two renewal notes with Northwest Bank in 2017. The original amount of indebtedness, including subsequent advances, was $7,668,000. The notes matured on January 5, 2019, at which time Capra had failed to make the payments due. McCormick 106 filed suit to foreclose the subject mortgage, for a personal deficiency, and for attorney's fees, costs, and expenses.

¶ 8 B. The Petition to Appoint Receiver

¶ 9 McCormick 106 filed an amended petition to appoint receiver pursuant to section 15-1704 of the Illinois Mortgage Foreclosure Law (IMFL) (735 ILCS 5/15-1704 (West 2018)). The amended petition was verified by Timothy Cathey, Vice President of McCormick 106, and asserted that Capra owed a principal balance of $2,587,760 on Note A and $2,105,499.38 on Note B, respectively, plus accrued interest, default interest, escrow deficiency, late fees, and attorney's fees and costs. McCormick 106 asserted that it was entitled to an order appointing a receiver because Capra had failed to make the payment due on the date the notes matured.

¶ 10 Capra filed an objection to that petition arguing, *inter alia*, there was good cause to deny the petition in that

"there are imminent transactions pending which would resolve any alleged deficiencies in the subject mortgages. If a receiver were to be allowed at this juncture, the appointment of a receiver would only impose additional procedural hurdles for the completion of the sale

of property and for the financing. In addition, the appointment of a receiver would result in significant expense, which would only reduce the amount of funds available to pay any lien holders (such as Plaintiff claims to be), and is counterproductive to payment of the claimed debt."

Capra also argued that he was entitled to retain possession of the properties upon the same terms and conditions as the proposed receiver and that the proposed receiver was not appropriate. Further, McCormick 106 was not a lienholder as to a portion of one of the subject properties.

¶ 11                    C. Capra's Affirmative Defenses and Answer

¶ 12    Capra next filed an answer to the complaint in which he admitted (1) the original note was in the amount of $7,668,000, and (2) he did not pay the sums of $2,587,760 and $2,105,499.38, respectively, on January 5, 2019. Capra generally denied the remaining allegations in the complaint. The answer incorporated several affirmative defenses.

¶ 13    In the affirmative defenses, Capra alleged improper clouding of title and void mortgage—counts the trial court later struck and which are not at issue here—and various breaches of contract. The breach-of-contract claims alleged that McCormick 106 (1) failed to apply certain payments toward indebtedness as required by the notes, (2) improperly used payments by Capra to pay real estate taxes, (3) improperly held funds ($102,021 and $18,688) without applying them to indebtedness, (4) failed to apply certain payments toward taxes and insurance, and (5) failed to apply $65,346.72 (of the $2,165,346.72 received from the sale of one of the properties) toward indebtedness. Capra asserted these breaches were material and justified his nonperformance, thus McCormick 106 had no legal basis on which to foreclose. Capra did not allege that McCormick 106 intended to convert funds paid.

¶ 14 Following argument on the petition to appoint receiver, the trial court entered an order appointing a receiver (Eric Janssen of Chicago Real Estate Resources (CRER)) on June 3, 2019. The court concluded that McCormick 106 had met its burden of showing a reasonable probability of prevailing at a final hearing of the cause and that Capra failed to show good cause as to why the receiver should not be appointed. The court enumerated the receiver's various specific duties and restrictions, as well as "all the duties, responsibilities and powers enumerated in the Illinois Mortgage Foreclosure Law (735 ILCS 5/15-1101 *et seq.*) along with other duties and obligations under Illinois law."

¶ 15                     D. Properties Sold During the Litigation

¶ 16 On June 4, 2019, Capra filed a Chapter 11 bankruptcy petition in federal court. Pursuant to an order in the bankruptcy court, the trial court subsequently entered an order allowing the sale of two of the properties (Creekview 1 and Creekview 2). In addition, the Lonergan property was later sold pursuant to a receiver sale authorized by the court, with the South Alpine and Forest Hill properties remaining in receivership.

¶ 17                     E. The Motion to Remove the Receiver

¶ 18 Capra filed a motion to remove the receiver on May 26, 2020, and also sought leave to file a third-party complaint against him. The trial court granted leave to file, and Capra filed a third-party complaint on June 15, 2020. In these filings, Capra asserted that the receiver "is obligated to act in the best interest of the mortgagor," "*first and foremost*" (emphasis added), pursuant to section 15-1704 of the IMFL in that the receiver owed Capra a fiduciary duty. Capra alleged the receiver violated his duties by: (1) listing McCormick 106 as a "client" in his Broker Opinion of Value reports, (2) failing to provide reports to Capra prior to February 2020, (3) intentionally failing to actively market the properties between July 2019 and March 31, 2020, resulting in three

additional vacancies in the Forest Hills property and 1 additional vacancy in the Lonergan property, (4) failing to respond to multiple inquiries from a real estate agent about the Lonergan property, and (5) seeking input from McCormick 106 regarding, *inter alia*, insurance coverage and when to market the properties.

¶ 19    The receiver filed a motion to dismiss the third-party complaint pursuant to section 2-615 of the Code of Civil Procedure (Code) (735 ILCS 5/2-615 (West 2020)) and a response in opposition to the motion to remove the receiver. The receiver argued that he complied with all orders of the court in its order appointing him and that a receiver does not owe a mortgagor a fiduciary duty under section 15-1704 of the IMFL.

¶ 20    Following argument on the motions, the trial court entered a written order on October 26, 2020, granting the receiver's motion to dismiss the third-party complaint and denying Capra's motion to remove the receiver. The court explained that a receiver is an officer of the court and not a fiduciary or agent of the mortgagor. Accordingly, a receiver's actions are judged under a "prudent person" standard. 735 ILCS 5/15-1704(c) (West 2018). Moreover, Capra had filed a bankruptcy petition on June 4, 2019, which operated as a stay pursuant to 11 U.S.C. § 362 (2018). The stay remained in place until September 3, 2019. The trial court further explained that subsection 15-1704(h) "allows for removal of the Receiver on 'good cause shown' " and that "good cause" requires more than a mortgagor's "disagreement with the manner in which the Receiver performed his job." To show good cause, the receiver must have "acted outside the court's order appointing him, indicative of some sort of malfeasance or bad faith, and which actually causes harm to the estate."

¶ 21    In sum, the court found that Capra's allegations failed to show that the receiver was not acting prudently or that he was not following the court's orders, thus Capra did not show good

cause for removal. As for the third-party complaint, the court concluded that Capra failed to state a cause of action in that the IMFL does not provide for direct suits by mortgagors against receivers. Instead, the only remedies available to a mortgagor against a receiver under the IMFL are (1) contempt of court proceedings or (2) removal pursuant to subsection 15-1704(h).

¶ 22                                    F. Summary Judgment

¶ 23    McCormick 106 filed a motion for summary judgment pursuant to section 2-1005 of the Code (735 ILCS 5/2-1005(c) (West 2020)) on February 18, 2020, and Capra filed a response in opposition on June 25, 2020. In his response, Capra argued that McCormick 106 materially breached the contract in several respects, thus precluding entry of summary judgment. Capra reasserted the breach-of-contract claims in his affirmative defenses, adding additional allegations that McCormick 106 improperly charged Capra additional "additional 'secondary interest' of $95,687.23" and that its conduct caused Capra to incur a penalty of $609.92 for late payment of real estate taxes for one of the properties. In sum, he contended that McCormick 106 breached the mortgage contract by overcharging Capra by more than $150,000 and holding more than $100,000 in a separate account, causing damages in excess of $300,000. As a result, he claims he was discharged from performing his obligations under the underlying mortgage contract.

¶ 24    The trial court granted McCormick 106's motion in a July 23, 2020, order.

¶ 25                          G. Motion to Confirm the Judicial Sale

¶ 26    Finally, a judicial sale for the South Alpine and Forest Hills properties was held on October 6, 2020. McCormick 106 was the highest bidder for each. On December 3, 2020, McCormick 106 filed a motion requesting the trial court to confirm the judicial sales and enter a deficiency judgment against Capra. Capra filed a response in opposition to the motion.

¶ 27     In his response, Capra highlighted a number of email exchanges between the receiver and Cathey (an agent of McCormick 106). First, in June 2019, shortly after Capra filed his bankruptcy case, Cathey emailed the receiver: "In short, I think you just maintain the status quo and make whatever critical repairs are necessary to preserve/secure the collateral." Capra noted that Cathey did not discuss leasing vacant units.

¶ 28     Next, on August 12, 2019, the receiver emailed Cathey, "We received an inquiry this morning regarding leasing spaces at Alpine Plaza. Before I respond, what can we do here?" and followed up, "Do you want us to lease anything?" The same day, Cathey replied, "Let's wait to see the outcome of the Lift of Stay motion. It should be heard tomorrow. Once we have stay lifted we can make a decision about leasing up or marketing 'as is.' "

¶ 29     Next, on August 15, 2019, Cathey emailed the receiver, "The bankruptcy judge punted a ruling on the Lift of Stay Motion until 9/3. Still think we stand down for now. Have there been much activity relative to interest in new leases or just this one inquiry?" The receiver replied, "There have been a couple of inquiries but not much. Of course, we are not actively marketing the vacant spaces for lease so that is not surprising."

¶ 30     Next, in an August 28, 2019, response to an inquiry by a co-worker ("Where are we on leasing prospects? Or are we waiting?"), Cathey replied, in relevant part, "The bankruptcy judge should rule on our Motion for Lift of Stay next Tuesday. I suspect it will be granted. We will immediately need to market the properties for sale. I'm open to discussion about entertaining new leases but I'm more focused on monetizing the collateral." The receiver was sent a carbon copy.

Andrew Werner[2] replied, "We will await the Tuesday decision and then perhaps discuss marketing buildings after that."

¶ 31    Capra also opined that an email from an attorney representing the receiver indicated that an interested renter left messages with the receiver requesting a tour of one of the properties, but the receiver did not respond to those messages until prompted by Capra's attorney. According to Capra, these correspondences showed that McCormick 106 instructed the receiver not to lease the subject properties purposely to devalue them, to deprive him of rental income, and to limit the pool of potential purchasers to cash purchasers, thus reducing the fair, competitive bidding and maximizing the potential deficiency judgment it could collect against Capra. The response emphasized that the properties were sold for $490,000 and $1,245,000, respectively. In contrast, the properties had been listed by the receiver for sale for $750,000 and $1,750,000, respectively.

¶ 32    McCormick 106 filed a reply addressing Capra's arguments. The trial court rejected Capra's request to deny confirmation of the judicial sale, finding "absolutely no evidence that the plaintiffs deliberately instructed the receiver not to lease at all" and characterized the appraisal valuations as "hypothetical," noting that market conditions had changed since the appraisal. The court granted McCormick 106's motion on February 26, 2021, confirming the judicial sales and entering a deficiency judgment against Capra for $2,517,677.68.

¶ 33    Capra timely appealed.

¶ 34                                    II. ANALYSIS

---

[2]Werner sent this response from a CRER email address and appears to be an associate of Janssen, the receiver.

¶ 35     At issue in this appeal is whether (1) the trial court erred in placing McCormick 106 in possession of the real estate and appointing a receiver, (2) the trial court erred in denying Capra's motion to remove the receiver and granting the receiver's motion to dismiss Capra's third-party complaint, (3) the trial court erred in granting McCormick 106's motion for summary judgment, and (4) the trial court abused its discretion when it confirmed the judicial sales of the remaining properties.

¶ 36     As explained in the following analysis, we hold that Capra's allegations contained in his affirmative defenses were insufficient to show that McCormick 106 materially breached the mortgage contract in that no reasonable person would conclude the alleged breaches were material. Accordingly, the trial court did not err when it placed McCormick 106 in possession of the real estate, appointed a receiver, and granted McCormick 106's motion for summary judgment. Moreover, Capra failed to state a claim against the receiver and failed to demonstrate good cause to remove the receiver because he failed to argue that the receiver violated any duty owed to Capra. Finally, the trial court did not abuse its discretion when it confirmed the judicial sale of the remaining properties because Capra's allegation that McCormick 106 chilled the bidding process is without merit.

¶ 37                    A. The Trial Court Did Not Err When It Appointed a Receiver

¶ 38     We begin by considering whether the trial court erred when it placed McCormick 106 in possession of the properties and appointed a receiver. Prior to the entry of a judgment of foreclosure, a mortgagee of non-residential real estate shall, upon request, be placed in possession of the real estate if (1) mortgagee is so authorized by the terms of the mortgage or other written instrument, (2) the court is satisfied that there is a reasonable probability that the mortgagee will prevail on a final hearing of the cause, and (3) the mortgagor fails to object and show good cause.

735 ILCS 5/15-1701(b)(2) (West 2018). "Whenever a mortgagee entitled to possession so requests, the court *shall* appoint a receiver." (Emphasis added.) *Id.* § 15-1702(a).

¶ 39    The reasonable probability determination is reviewed *de novo* where, as here, there was no evidentiary hearing. *Bank of America, N.A. v. 108 N. State Retail LLC*, 401 Ill. App. 3d 158, 165 (2010). A proven default establishes a reasonable probability of success in a mortgage foreclosure action under the IMFL. *Id.* at 166. "Whether a default in fact exists will typically turn on the interpretation of documentary evidence—a non-discretionary function." *Id.* Further, "good cause" is not defined in the IMFL, but in the case of nonresidential property, the mortgagee presumptively has the right of possession. *Forest Preserve District of Cook County v. Royalty Properties, LLC*, 2018 IL App (1st) 181323, ¶ 24.

¶ 40    Capra argues that the trial court erred in finding that McCormick 106 had a reasonable probability of success. He contends McCormick 106 materially breached the mortgage contract, citing *Rohr Burg Motors, Inc. v. Kulbarsh*, 2014 IL App (1st) 131664, ¶ 57, for the proposition that McCormick 106's material breach justified Capra's undisputed breach. He also asserts that his filing a verified denial of liability can negate his asserted default. Importantly, Capra admitted the factual allegations underlying the foreclosure complaint: he owed money under the contract and failed to pay in full on the due date. The notes provide that failure to make any payment when due constitutes an event of default, and Capra does not contest that he signed the notes. Capra also acknowledges that affirmative defenses admit the legal sufficiency of the plaintiff's cause of action. See *Vroegh v. J & M Forklift*, 165 Ill. 2d 523, 530 (1995); *Federal National Mortgage Association v. Altamirano*, 2020 IL App (2d) 190198, ¶ 21. He filed seven affirmative defenses to the foreclosure complaint and thus acknowledges that McCormick 106's cause of action—Capra's

default on the mortgage—was legally sufficient. Under these circumstances, Capra's inconsistent filing of a verified denial of liability is irrelevant.

¶ 41    Capra nevertheless contends that an evidentiary hearing was required to decide the matter, citing *Olympic Federal v. Witney Development Co.*, 113 Ill. App. 3d 981, 986 (1983), and *Brown County State Bank v. Kendrick*, 140 Ill. App. 3d 538, 540 (1986), for the proposition that his affirmative defenses on file were sufficient to defeat McCormick 106's foreclosure complaint. Essentially, Capra contends that uncontested allegations of default cannot establish a reasonable probability of success if a mortgagor presents affirmative defenses to the foreclosure. He insists that an evidentiary hearing is required to determine whether the affirmative defenses might defeat the foreclosure complaint.

¶ 42    In *Olympic Federal*, a mortgagee filed a complaint for foreclosure and moved to be placed in possession. The mortgagor moved to strike the motion to be placed in possession, arguing it was legally insufficient. The trial court denied the motion to strike and denied the mortgagor's request to respond to or answer the foreclosure complaint. The appellate court considered whether the trial court's denial of the mortgagor's request—thereby depriving the mortgagor of an opportunity to respond to the substantive factual allegations—was an abuse of discretion under Illinois Supreme Court Rule 183, which gives the trial court discretion to extend filing deadlines. *Olympic Federal*, 113 Ill. App. 3d at 986-89. It reasoned that denying the mortgagor an opportunity to deny the substance of the factual allegations was an abuse of discretion. *Id.* at 987, 989. *Olympic Federal* is readily distinguishable: here, Capra admitted the underlying factual allegations that he borrowed money and failed to tender payment on the due date.

¶ 43    In *Kendrick*, a mortgagor similarly appealed from an order placing the plaintiff mortgagee in possession of mortgaged real estate. Like in *Olympic Federal*, the mortgagor initially filed a

motion to strike the foreclosure complaint, which the trial court denied. Unlike in *Olympic Federal*, the mortgagor then filed a sworn denial of the mortgagee's request for possession, and the trial court conducted an evidentiary hearing, at which the mortgagor presented no evidence. The court granted the mortgagee's request and placed it in possession. On appeal, the appellate court affirmed, noting that "[the] plaintiff alleged and proved a default on all notes secured by the mortgages" and "defendants do not contest the fact of default." *Kendrick*, 140 Ill. App. 3d 538, 540 (1986).

¶ 44 Unlike the mortgagor in *Olympic Federal*, Capra had the opportunity to deny the substance of the underlying factual allegations. Like the mortgagor in *Kendrick*, Capra does not contest the underlying factual allegation that he failed to pay the amount due under the contract on the date the money became due. To the contrary, he admits the validity of the notes, his failure to make the required payments on the due date, and the legal sufficiency of the complaint. Thus, he concedes that he defaulted, though he contends that, ultimately, he could defeat the foreclosure.

¶ 45 To the extent that his affirmative defenses could defeat the foreclosure, it does not necessarily follow that, where a mortgagor concedes the facts that establish a default, a mortgagee's pleading viable affirmative defenses renders the mortgagee's probability of success unreasonable. That the mortgagee presumptively has the right to possession in the case of nonresidential property (*Royalty Properties, LLC*, 2018 IL App (1st) 181323, ¶ 24) makes such a rule dubious, and Capra offers no authority that establishes one. We therefore adhere to the principle that a proven default establishes a reasonable probability of success. *108 N. State Retail LLC*, 401 Ill. App. 3d at 166.

¶ 46 The trial court held argument on McCormick 106's motion on May 22, 2019. McCormick 106 had not filed a response to Capra's affirmative defenses prior to the hearing, and no evidence

was presented. Capra insists that the trial court was required to hold an evidentiary hearing to determine whether his affirmative defenses had merit and, failing to do so, the court lacked authority to place McCormick 106 in possession. We disagree. McCormick 106's factual allegations, admitted by Capra and supported with documentary evidence, were sufficient to establish a reasonable probability of success in that Capra defaulted. *108 N. State Retail LLC*, 401 Ill. App. 3d at 166.

¶ 47　Moreover, for the reasons outlined in our summary judgment analysis, Capra's affirmative defenses were inadequate. Even if his allegations were proved, Capra failed to allege facts that could have justified his non-performance and defeated the foreclosure action. Thus, the trial court did not err when it concluded that McCormick 106 had a reasonable probability of success, placed McCormick 106 in possession, and appointed a receiver.

¶ 48　　　　B. The Trial Court Did Not Err When It Denied Capra's Motion to

Remove the Receiver and Granted the Receiver's Motion to Dismiss

¶ 49　Next, Capra argues that the trial court improperly dismissed his third-party complaint against the receiver and his motion to remove the receiver. The receiver moved to dismiss the third-party complaint pursuant to section 2-615 of the Code and filed an objection to the motion to remove the receiver. On appeal, Capra contends that the trial court failed to adequately address his claim that the receiver purposely failed to engage in leasing activities, thereby devaluing the properties and depriving Capra of potential rental income.

¶ 50　A motion to dismiss pursuant to section 2-615 challenges the legal sufficiency of a pleading. 735 ILCS 5/2-615 (West 2020); *In re Application for a Tax Deed*, 2021 IL 126150, ¶ 17. A reviewing court accepts as true all well-pleaded facts and any reasonable inferences arising therefrom. We review the pleadings in the light most favorable to the nonmovant to determine if

they state a cause of action or, alternatively, if they clearly show the nonmovant could not recover under any set of facts. *Id.* A trial court's ruling on the motion is reviewed *de novo*. *Id.*

¶ 51 "The court may remove a receiver upon a showing of good cause." 735 ILCS 5/15-1704(h) (West 2020). There mere imposition of procedural hurdles in using property does not constitute good cause for removing or declining to appoint a receiver under section 15-1704 of the IMFL. See *CenterPoint Properties Trust v. Olde Prairie Block Owner, LLC*, 398 Ill. App. 3d 388, 396 (2010) ("While we do not dispute defendant's assertion that the appointment of a receiver likely imposes additional procedural hurdles for defendant in its efforts to develop, refinance or sell the property, we do not find that such potential impediments are sufficient to overcome the statutory presumption in favor of placing the mortgagee in possession."). As with a ruling on a motion to appoint a receiver, which also calls for a "good cause" inquiry, we review the trial court's ruling on the motion to remove the receiver *de novo* in the absence of an evidentiary hearing. *108 N. State Retail LLC*, 401 Ill. App. 3d at 165.

¶ 52 The IMFL imposes various duties on receivers managing mortgaged real estate, including a duty to "manage the mortgaged real estate as would a prudent person, taking into account the effect of the receiver's management on the interest of the mortgagor." 735 ILCS 5/15-1704(c) (West 2020). Moreover, the IMFL provides that a receiver:

> "(1) shall maintain the existing casualty and liability insurance required in accordance with the mortgage or applicable to the real estate and other property subject to the mortgage at the time the receiver took possession;
>
> (2) shall use reasonable efforts to maintain the real estate and other property subject to the mortgage in at least as good condition as existed at the time the receiver took possession, excepting reasonable wear and tear and damage by any casualty;

(2.5) shall accept all rental payments from an occupant of the mortgaged property, and any payments from a third party or any rental assistance program in support of an occupant's housing;

(3) shall apply receipts to payment of ordinary operating expenses, including royalties, rents and other expenses of management;

(4) shall pay any shared or common expense assessments due to any association of owners of interests in real estate to the extent that such assessments are or may become a lien against the mortgaged real estate;

(5) may pay the amounts due under any mortgage if the mortgagee thereof is not a party in the foreclosure;

(6) may carry such additional casualty and liability insurance as is reasonably available and reasonable as to amounts and risks covered;

(7) may make other repairs and improvements necessary to comply with building, housing, and other similar codes or with existing contractual obligations affecting the mortgaged real estate;

(8) may hold receipts as reserves reasonably required for the foregoing purposes; and

(9) may take such other actions as may be reasonably necessary to conserve the mortgaged real estate and other property subject to the mortgage, or as otherwise authorized by the court." *Id.*

Capra argues that these statutory duties are "in the nature of a fiduciary obligation," thus a receiver owes a mortgagor a fiduciary duty. "A fiduciary relationship imposes a general duty on the fiduciary to refrain from 'seeking a selfish benefit during the relationship.' " *Neade v. Portes*, 193 Ill. 2d 433, 440 (2000).

¶ 53    Capra cites no authority to support the assertion that receivers owe mortgagors a fiduciary duty, which is refuted by the text of the statute in that it enumerates specific duties but makes no mention of any fiduciary duty. "The rule that the expression of one thing or one mode of action in an enactment excludes any other, even though there be no negative words prohibiting it, has been the settled law of this state since 1852." *People ex rel. Nelson v. Wiersema State Bank*, 361 Ill. 75, 85 (1935); see also *Bridgestone/Firestone, Inc. v. Aldridge*, 179 Ill. 2d 141, 153-54 (1997) ("The maxim is applied only when it appears to point to the intent of the legislature, not to defeat the ascertained legislative intent. The rule may be overcome by a strong indication of legislative intent."). The legislature specified which duties a receiver owes and did not expressly impose any freestanding fiduciary duty on receivers, suggesting the intent to limit a receiver's duties. Further, Capra does not point to evidence that strongly indicates the legislature intended to impose a freestanding fiduciary duty. Capra's assertion that the receiver owed him a fiduciary duty is thus without merit.

¶ 54    A receiver is an officer of the court who secures and preserves the property for the benefit of all concerned. *In re Receivership of Grnacek*, 2012 IL App (3d) 110181, ¶ 42 (citing *People ex rel. Scott v. Pintozzi*, 50 Ill. 2d 115, 123 (1971)). Because Capra did not identify any actual duties that the receiver violated, he failed to state a claim against the receiver and failed to establish good cause to remove the receiver. Accordingly, the trial court did not err when it denied Capra's motion to remove the receiver and granted the receiver's motion to dismiss the third-party complaint.

¶ 55               D. The Trial Court Properly Rendered

                   Summary Judgment for McCormick 106

¶ 56    Capra next argues that the trial court erred when it granted McCormick 106's motion for summary judgment in that McCormick 106 materially breached the mortgage contract, thus relieving Capra's obligation to perform. Capra had alleged that McCormick 106 committed multiple contractual breaches that cumulatively resulted in a material breach of contract. Specifically, he asserted that McCormick 106 misallocated funds paid by Capra and charged unauthorized interest, resulting in over $300,000 in damages. Capra challenges the trial court's conclusion that these allegations did not present triable issues of fact as to whether McCormick 106 materially breached the contract.

¶ 57    Summary judgment is proper "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2020). To determine whether there is a genuine issue of material fact,

> "a court must construe the pleadings, depositions, admissions, and affidavits strictly against the movant and liberally in favor of the opponent. A genuine issue of material fact precluding summary judgment exists where the material facts are disputed or, if the material facts are undisputed, *reasonable persons might draw different inferences from the undisputed facts*. Summary judgment is a drastic means of disposing of litigation and, therefore, should be granted only where the right of the moving party is clear and free from doubt." (Emphasis added.) *Lewis v. Lead Industries Association*, 2020 IL 124107, ¶ 15.

Accordingly, where no reasonable person would draw an inference from undisputed (or immaterial) facts that is unfavorable to the movant, summary judgment shall be rendered. 735 ILCS 5/2-1005(c) (West 2020). We review *de novo* the trial court's ruling. *Lewis*, 2020 IL 124107, ¶ 15.

¶ 58    As stated, a material breach by one party justifies non-performance by another. *Rohr Burg Motors*, 2014 IL App (1st) 131664, ¶ 57. "A breach of contract is a non-performance of any contractual duty of immediate performance\*\*\* and may take place by failure to perform acts promised, by prevention or hindrance, or by repudiation." Restatement (First) of Contracts § 312 (1932). "A material breach of contract constitutes the 'failure to do an important or substantial undertaking set forth in a contract.' [Citation.]" *LB Steel, LLC v. Carlo Steel Corp.*, 2018 IL App (1st) 153501, ¶¶ 31, 38 (performance under airport canopy construction contract resulting in defective welds that were "critical for the safety of the whole canopy[ ]" and required remediation constituted a failure to perform a substantial undertaking). This question should be decided based on the inherent justice of the matter. *Rogers v. Balsley*, 240 Ill. App. 3d 1005, 1010-11 (1993) (holding that failure to strictly comply with contractual requirement to send notice to seller's home address was not material breach where seller had actual notice before deadline via their attorney).

¶ 59    The determination of materiality " 'involve[es] an inquiry into such matters as whether the breach worked to defeat the bargained-for objective of the parties or caused disproportionate prejudice to the non-breaching party, whether custom and usage considers such a breach to be material, and whether the allowance of reciprocal non-performance by the non-breaching party will result in his accrual of an unreasonable or unfair advantage.' [Citation.]" *Kel-Keef Enterprises, Inc. v. Quality Components Corp.*, 316 Ill. App. 3d 998, 1016-17 (2000) (holding trial court's finding that failure to deliver subset of manufacturing blueprints owned by business that sold replacement parts, in breach of implied warranty of title, was a material breach was supported by evidence that the business became less competitive without the blueprints, which were "very significant financially"). A breach may be material if it deprives the adverse party of a bargained-for right, without which it would not have signed a contract. See *Mayfair Construction Co. v.*

*Waveland Associates Phase I Ltd. Partnership*, 249 Ill. App. 3d 188, 202 (1993) (holding that refusal to submit disputes to third party designated by the contract was a material breach where the aggrieved party offered testimony that it would not have signed the contract without the dispute resolution provisions, which ensured work would proceed in a timely manner).

¶ 60    Capra did not dispute McCormick 106's claim that Capra defaulted on the notes by failing to make payments on their maturity dates. The claim was supported by copies of the promissory notes attached to the complaint, which matured on January 5, 2019; and by the verified petition to appoint receiver, which asserted that, at the time of the default, Capra owed approximately $4.7 million in principal and failed to pay the loan in full. Rather, Capra filed affirmative defenses that he asserts were sufficient to establish that McCormick 106 materially breached the mortgage contract, thus precluding foreclosure. In support that the breaches were material, Capra argues,

"The foregoing breaches defeat the bargained-for objective of the financing—it is not the objective to allow the lender to overreach to recover excess funds from the borrower, yet that is what occurred. It is not the objective to create financial hurdles which prevent the borrower to pay down the principal, yet that is what occurred. It is not the objective to cause an inaccurate payoff figure for the loan in favor of the lender, yet that is what occurred.

What occurred resulted in a disproportionate prejudice to Capra, as McCormick has been, and is, in the position of power, McCormick controlled the decision to issue partial releases, thus controlling whether or not Capra could sell any of the collateral. Capra had no bargaining authority with McCormick, and McCormick dictated the terms under which it would issue a release to the Riverside Apartments.

Even after this litigation was filed, McCormick continued with its conduct, misappropriating sales proceeds from the Creekview Property sale to unsubstantiated 'secondary interest.' "

In sum, Capra asserted that McCormick 106 misused upwards of $200,000 in funds that were not applied to indebtedness and caused damages in excess of $300,000.

¶ 61 First, Capra's assertion that he suffered upwards of $300,000 is fanciful. While he claims McCormick 106 misallocated funds, this is not tantamount to a permanent deprivation. Capra does, to some extent, claim there is a permanent deprivation, consisting of a $609.92 tax penalty and an improper charge of "additional 'secondary interest' " totaling $95,687.23. With respect to the sums he alleged McCormick 106 misallocated and held in escrow—slightly more than $200,000—there is no corresponding assertion that McCormick 106 intended to convert those funds. In any event, damages resulting from mere misallocation would almost certainly be much lower than the amount misallocated, and significantly less than the purchase price. *C.f. InsureOne Independent Insurance Agency, LLC v. Hallberg*, 2012 IL App (1st) 092385, ¶ 44 (holding that sixteen-month delay in making final payments in asset purchase agreement was not material where trial court found the delay was attributable to the complexity of calculating amount due and underpaying constituted less than 1% of whole purchase price).

¶ 62 To accept Capra's contention that McCormick 106's alleged breaches were material, a trier of fact would need to conclude that some level of damages between approximately $100,000 and $300,000 justified Capra's failure to pay approximately $4.7 million when the notes matured. The high-end figure represents about 6.4% of the amount of unpaid principal at the time of his alleged default, and 4% of the original principal amount. In his reply brief, Capra asserts, without citing specific authority, that his ability to pay the remaining balance in full on the maturity date of the

notes was irrelevant to whether McCormick 106's alleged breaches were material. We disagree. Capra's shortcoming of over $4 million is highly relevant.

¶ 63    Capra does not claim that the alleged misuse of funds interfered with his use of the real property under the contract or otherwise affected his business. Instead, he argues that he suffered prejudice in that "McCormick has been, and is, in the position of power," that "McCormick controlled the decision to issue partial releases, thus controlling whether or not Capra could sell any of the collateral," and that "Capra had no bargaining authority with McCormick, and McCormick dictated the terms under which it would issue a release to the Riverside Apartments." Essentially, Capra's argument is that he was prejudiced because McCormick 106 exercised its contractual rights in an arm's-length, commercial transaction, which has no merit.

¶ 64    Capra also fails to support with any specificity his assertion that McCormick 106's breaches defeated any bargained-for objectives. Instead, he merely reiterates that McCormick 106's alleged breaches were not bargained-for objectives. His argument is that McCormick 106 materially breached the contract because it breached the contract. This tautology forfeits the argument. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("The appellant's brief *** shall contain the contentions of the appellant *and the reasons therefor*"). Moreover, Capra does not argue that the alleged breaches are considered to be material by way of custom or usage (*Kel-Keef Enterprises*, 316 Ill. App. 3d at 1016-17), resulted in an unfair advantage accruing to McCormick 106 (*id.*), or deprived Capra of a significant bargained-for right, without which he would not have signed the contract (*Mayfair Construction*, 249 Ill. App. 3d at 202).

¶ 65    Capra failed to allege sufficient facts to create a genuine issue as to whether McCormick 106 materially breached the contract. Capra did not contest the assertion that he owed approximately $4.7 million in principal on the date the notes matured, nor did he assert that he was

ready and able to pay the remaining balance in full but for McCormick 106's alleged breaches. The allegation that upwards of $200,000 in funds had not been applied to indebtedness as required by the contract was unaccompanied by any allegation of conversion. There is nothing in the record to suggest that McCormick 106 would have retained those funds had Capra tendered full or near-full payment for the remainder due.

¶ 66     No reasonable person would conclude that the alleged misallocation of funds and excessive interest charge, in light of the substantial unpaid balance, constitutes a failure to perform an important or substantial contractual undertaking sufficient to excuse Capra from tendering payment on the date the notes matured. See *LB Steel, LLC v. Carlo Steel Corp.*, 2018 IL App (1st) 153501, ¶ 31. Relieving Capra of his obligation to pay would be inherently unjust. See *Rogers*, 240 Ill. App. 3d at 1010-11. Accordingly, no reasonable person would find that McCormick 106 *materially* breached the contract. Stated differently, Capra's claim that his affirmative defenses raised a genuine issue of material fact as to whether McCormick 106 materially breached is not reasonable. Even if Capra proves McCormick 106 breached the contract and caused him upwards of $300,000 in damages, it would be unreasonable to conclude that the breaches in any way contributed to Capra coming up $4.7 million short at the time his notes were due, or otherwise justified his failure to pay off the remaining principal on the due date. Capra's bare assertion that his ability to pay the loan in full on the due date is "irrelevant" has no merit.

¶ 67     Viewing the documents on file liberally in Capra's favor, we nevertheless conclude that Capra was on a trajectory to default regardless of McCormick 106's alleged breaches. Capra borrowed $7,668,000 under the contract, inclusive of future increases, beginning in September 2008. In November 2017, Capra executed two renewal notes for principal amounts of $4,800,000 and $2,105,499.38, respectively. At the time of default, Capra still owed $2,587,760 and

$2,105,499.38 in principal, respectively, plus accrued interest and other costs, but tendered no payment on the maturity date of the notes. The trial court did not err when it determined that Capra raised no genuine issue of material fact as to whether McCormick 106 materially breached the contract, and that McCormick 106 was entitled to judgment as a matter of law.

¶ 68                    E. The Trial Court Did Not Abuse Its Discretion

                          When It Confirmed the Judicial Sale

¶ 69    Last, Capra argues that the trial court erred when it confirmed the October 6, 2020, judicial sale of the South Alpine and Forest Hills properties. Upon entry of a judgment of foreclosure, the subject real estate *shall* be sold at a judicial sale. 735 ILCS 5/15-1507(a) (West 2020). After the sale, the court shall, upon motion, conduct a hearing to confirm the sale. *Id.* § 1508(b). The court shall then enter an order confirming the sale "[u]nless the court finds that (i) a notice required in accordance with subsection (c) of Section 15-1507 was not given, (ii) the terms of sale were unconscionable, (iii) the sale was conducted fraudulently, or (iv) justice was otherwise not done." *Id.*

¶ 70    A court's decision to confirm a judicial sale under the IMFL is reviewed for an abuse of discretion. *Household Bank, FSB v. Lewis*, 229 Ill. 2d 173, 178 (2008). This is true even in the absence of an evidentiary hearing. See *Deutsche Bank National v. Burtley*, 371 Ill. App. 3d 1, 6 (2006) ("The Illinois General Assembly did not*** intend to require an extended evidentiary hearing after each sheriff's sale. [Citation.] While the provision provides for a hearing, the extent of the hearing afforded a mortgagor is left to the sound discretion of the circuit court. [Citation.]"). A trial court abuses its discretion if its ruling is arbitrary, fanciful, or unreasonable. *Brown v. Illinois State Police*, 2021 IL 126153, ¶ 49. The party opposing confirmation carries the burden of

proving sufficient grounds to disapprove the sale exist. *CitiMortgage Inc. v. Lewis*, 2014 IL App (1st) 131272, ¶ 31.

¶ 71    Capra argues that the trial court confirmed the judicial sales in error. He reiterates his arguments in the trial court, arguing that McCormick 106 instructed the receiver not to lease the subject properties purposely to devalue them, to deprive him of rental income, and to limit the pool of potential purchasers to cash purchasers, thus reducing the fair, competitive bidding and maximizing the potential deficiency judgment it could collect against Capra.

¶ 72    McCormick 106 responds that the December 2018 appraisals were unreliable. First, the South Alpine appraisal was based on a hypothetical condition and an extraordinary assumption regarding the condition of the interior. Second, the Forest Hills appraisal indicated that there were 11 fully-occupied units, whereas the receiver's initial report indicated that there were 10 units with 2 vacancies. Indeed, Capra concedes that those appraisals are irrelevant to his argument.

¶ 73    Instead, Capra urges this court to consider the difference between the receiver's October 2020 listing prices and McCormick 106's bids at the judicial sale. He acknowledges that property sold at a forced sale does not bring its full value, and that inadequacy of price is an insufficient ground to set aside a judicial sale. See *Lyons Savings & Loan Association v. Gash Associates*, 189 Ill. App. 3d 684, 688-89 (1989). He nevertheless contends that the communications between Cathey and the receiver demonstrate injustice in the process. McCormick 106 explains that the June 2019 and August 2019 correspondences between Cathey and the receiver occurred while the automatic stay in the bankruptcy litigation was in place; thus, they do not suggest any fraud or collusion. Capra does not respond to this argument.

¶ 74    We conclude that Capra's assertions have no merit. Each of the correspondences involving Cathey took place while the bankruptcy stay was in place, as McCormick 106 points out, and

McCormick 106 was constrained by that stay from exercising control over the properties as it was not a bankruptcy trustee. See 11 U.S.C. § 362(a)(4) (2018) ("Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title*** operates as a stay, applicable to all entities, of*** *any act* to obtain possession of property of the estate or of property from the estate or *to exercise control over property of the estate*" (emphases added)); *id.* § 363(b)(1) (authorizing a trustee, "after notice and a hearing, [to] use, sell, or lease, other than in the ordinary course of business, property of the estate"); *id.* § 323 ("The trustee in a case under this title is the representative of the estate"). Many of the statements Capra highlights specifically mentioned the bankruptcy stay. They no more support an inference that Cathey wanted to chill bidding than that Cathey wanted to ensure compliance with the bankruptcy stay. To the contrary, Cathey actually acknowledged that the receiver was obligated to affirmatively market the properties for sale once the stay was lifted ("The bankruptcy judge should rule on our Motion for Lift of Stay next Tuesday. I suspect it will be granted. *We will immediately need to market the properties for sale.*" (Emphasis added)).

¶ 75 Further, we observe that, although a receiver has the statutory *power* to secure tenants and execute leases (735 ILCS 5/15-1704(b)(2) (West 2018)) and a statutory duty *to accept all rental payments* (*id.* § 15-1704(c)(2.5)), a receiver has no statutory *duty to secure tenants and execute leases* (see *id.* § 15-1704(c)). The lack of a duty on the part of a receiver to secure new tenants arguably rebuts the assertion that discouraging a receiver from doing so is unjust. At any rate, Capra does not support his implied contention that more vacancies necessarily reduces the value or desirability of nonresidential real property, which is sometimes purchased for redevelopment.

¶ 76 The trial court thus did not abuse its discretion when it confirmed the judicial sale of the remaining properties.

¶ 77                                    III. CONCLUSION

¶ 78    For the reasons stated, we affirm the judgment of the circuit court of Winnebago County.

¶ 79    Affirmed.